BUCKEYE UNION INSURANCE CO.,
APPELLEE, *v.* LIBERTY SOLVENTS
AND CHEMICALS CO., INC., APPELLANT.

(No. 11598—Decided July 11, 1984.)

*William J. Cady,* for appellee.
*Richard L. Creighton* and *Robert E. Coletti,* for appellant.

QUILLIN, J. In this case, Liberty Solvents & Chemicals Co., Inc. (Liberty Solvents), appeals from the trial court's determination on summary judgment that Buckeye Union Insurance Co. (Buckeye) has no duty to defend or indemnify its insured, Liberty Solvents, against the claims made by the state of Ohio and the United States relating to the clean-up of a hazardous waste facility owned and operated by Chem-Dyne Corp. We reverse.

On September 14, 1982, the state of Ohio filed an action in federal district court against Liberty Solvents and

thirty-seven other entities for damages, injunctive, and declaratory relief in connection with the hazardous waste facility in Hamilton County, Ohio operated by Chem-Dyne. The complaint alleges that generators of hazardous waste, including Liberty Solvents, contracted with Chem-Dyne for the disposal of the hazardous waste, and that the waste was spilled, leaked, released or otherwise discharged when drums were dropped and ruptured or punctured by Chem-Dyne, thereby polluting the surface waters, soil and groundwater in and around the disposal site.

On April 13, 1983, the United States filed an amended complaint against Liberty Solvents in the same federal court for damages caused at the Chem-Dyne site. The state and federal lawsuits were thereafter consolidated for trial. As the complaint filed by the United States interjects no new or additional facts or causes of action against Liberty Solvents, the discussion of the issues that follows will focus solely on the complaint filed by the state of Ohio.

Liberty Solvents notified its insurer, Buckeye, of the pending lawsuits and requested that Buckeye defend the actions under the terms of the policy. On March 3, 1983, Buckeye filed this declaratory judgment action seeking a determination that it has no duty to defend and/or indemnify Liberty Solvents for the damage claims set forth in the two complaints. Liberty Solvents counterclaimed for a declaration that Buckeye is required to defend and indemnify.

Both parties filed motions for summary judgment. Liberty Solvents requested partial summary judgment on the issue of Buckeye's duty to defend. Buckeye sought summary judgment on both its duty to defend and indemnify. The trial court denied Liberty Solvents' motion and granted the motion of Buckeye, holding that Buckeye has no duty to defend the claims against Liberty Solvents nor a duty to indemnify

Liberty Solvents. Liberty Solvents appeals, setting forth the following assignments of error:

"1. The trial court erred to the prejudice of defendant-appellant in granting plaintiff-appellee's motion for summary judgment.

"2. The trial court erred to the prejudice of defendant-appellant in not granting defendant-appellant's motion for partial summary judgement."

Upon consideration of the arguments set forth by the parties and the relevant case law, and for the reasons stated below, we sustain both assignments of error.

The question presented by this appeal is whether the allegations of the complaint state a claim for which coverage is or may be afforded by the policy of insurance.

In *Willoughby Hills* v. *Cincinnati Ins. Co.* (1984), 9 Ohio St. 3d 177, the court held that:

"Where the insurer's duty to defend is not apparent from the pleadings in the action against the insured, but the allegations do state a claim which is potentially or arguably within the policy coverage, or there is some doubt as to whether a theory of recovery within the policy coverage has been pleaded, the insurer must accept the defense of the claim."

We apply this test in conjunction with Civ. R. 56, which states in part:

"(C) * * * Summary judgment shall be rendered forthwith if the pleading, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence in the pending case, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. * * * A summary judgment shall not be rendered unless it appears from such evidence or stipulation and only therefrom, that reasonable minds can

come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, such party being entitled to have the evidence or stipulation construed most strongly in his favor. * * *.''

We conclude that the trial court erred in granting summary judgment to Buckeye and in failing to grant Liberty Solvents' motion for partial summary judgment. From the state of the record before us, it appears that the complaint against Liberty Solvents does state a claim which may be within the coverage afforded by the policy of insurance. Buckeye must therefore accept the defense of Liberty Solvents even though it may ultimately be determined that there is no duty of indemnification. This latter question is not now before this court.

In part, the state's complaint alleges that:

''* * * Chemical wastes, including wastes containing hazardous substances, arrived at the Chem-Dyne site in drums, barrels, tank trucks, railroad cars and other containers. At times relevant to the allegations in this complaint, Chem-Dyne or its affiliates transferred such wastes from some of the aforementioned containers, mixing or blending some of the material as 'chem-fuel' for sale to other parties. Waste materials, including 'hazardous substances' * * * were mixed, blended or commingled in open pits, loading docks and bulk storage tanks. Thousands of drums and other containers have been stored on the Chem-Dyne site for prolonged, indefinite periods, exposed to the weather. Many drums are now in a rusted or corroded condition. Drums were placed in stacks as tall as four drums high and were sometimes creased, dropped and ruptured or otherwise punctured by Chem-Dyne or its affiliates. Many drums at the Chem-Dyne site are missing tops or bungs or otherwise lack secure and proper closures. * * *''

From these allegations, the complaint arguably states the following claims for relief against Liberty Solvents: (1) strict liability under the Comprehensive Environmental Response, Compensation and Liability Act, Section 9601 *et seq.*, Title 42, U.S. Code (Superfund Act); (2) nuisance in violation of R.C. 3767.02; (3) common-law strict liability for engaging in an ultrahazardous activity; (4) common-law negligence in contracting with Chem-Dyne; (5) common-law recklessness in contracting with Chem-Dyne; and (6) breach of the non-delegable duty to assure the safe and proper storage, treatment and disposal of its waste products.

The Superfund Act creates a $1.8 billion fund to finance cleanup operations of environmentally polluted areas. Section 9607, Title 42, U.S. Code, provides in part, as follows:

''(a) Covered persons; scope

''Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section —

''(1) the owner and operator of a vessel (otherwise subject to the jurisdiction of the United States) or a facility,

''(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,

''(3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility owned or operated by another party or entity and containing such hazardous substances, and

''(4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities or sites selected by such per-

son, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for —

"(A) all costs of removal or remedial action incurred by the United States Government or a State not inconsistent with the national contingency plan

"(B) any other necessary costs of response incurred by any other person consistent with the national contingency plan; and

"(C) damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release.

"(b) Defenses

"There shall be no liability under subsection (a) of this section for a person otherwise liable who can establish by a preponderance of the evidence that the release or threat of release of a hazardous substance and the damages resulting therefrom were caused solely by —

"(1) an act of God;

"(2) an act of war;

"(3) an act or omission of a third party other than an employee or agent of the defendant, or than one whose act or omission occurs in connection with a contractual relationship, existing directly or indirectly, with the defendant (except where the sole contractual arrangement arises from a published tariff and acceptance for carriage by a common carrier by rail), if the defendant establishes by a preponderance of the evidence that (a) he exercised due care with respect to the hazardous substance concerned, taking into consideration the characteristics of such hazardous substance, in light of all relevant facts and circumstances, and (b) he took precautions against foreseeable acts or omissions of any such third party and the consequences that could foreseeably

result from such acts or omissions; * * *."

The above section establishes strict liability for three categories of "responsible persons": (1) present and former owners of hazardous waste disposal sites; (2) transporters of hazardous wastes; and (3) those who arrange for the transport or disposal of hazardous wastes. This latter category normally is comprised of generators (producers) of hazardous waste. It should be noted that liability may be imposed on one, two or all three of the "responsible persons" regardless of each entity's relative degree of fault, or responsibility, in the creation of the hazardous condition.

We are not called upon here to pass upon the question of Liberty Solvents' liability under the Superfund Act. We need only determine whether the complaint sets forth the theory of liability against Liberty Solvents, coverage for which may arguably be included within the insurance policy. Our discussion centers on the Superfund Act not because the various other common-law theories of liability alleged in the complaint have no merit, but because we, like the trial court, perceive the Superfund claim to be the primary and predominent cause of action and the essence of the complaint.

Liability under the Act is predicated upon one's status as a responsible person, i.e., a generator, a transporter, or a disposer of hazardous wastes. Liberty Solvents is subjected to potential liability under the Act simply because of its status as a generator of hazardous chemical waste products. This potential liability under the Superfund Act establishes Buckeye's duty to defend Liberty Solvents unless there is a provision in the policy which clearly and unambiguously excludes coverage.

The policy provides that:

"The company will pay on behalf of the insured all sums which the insured

shall become legally obligated to pay as damages because of

"* * *

"B. property damage to which this insurance applies, caused by an occurrence, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such * * * property damages, even if any of the allegations of the suit are groundless, false or fraudulent, * * *."

"An occurrence" under the policy is defined as follows:

" 'occurrence' means an accident, including continuous or repeated exposure to conditions, which results in * * * property damage neither expected nor intended from the standpoint of the insured;"

In determining whether the complaint potentially states a claim which is within the coverage of the policy, we must first examine whether under the facts of this case, there has been an "occurrence" within the meaning of the policy. The trial court found that there was no such "occurrence." We disagree.

At the outset we note that:

"A contract of insurance prepared and phrased by the insurer is to be construed liberally in favor of the insured and strictly against the insurer, where the meaning of the language used is doubtful, uncertain or ambiguous. (Paragraph one of the syllabus of *Toms* v. *Hartford Fire Ins. Co.*, 146 Ohio St. 39 [31 O.O. 538], approved and followed.)" *Munchick* v. *Fidelity & Casualty Co.* (1965), 2 Ohio St. 2d 303 [31 O.O.2d 569], paragraph one of the syllabus.

Construing a virtually identical definition of "occurrence," the court in *Grand River Lime Co.* v. *Ohio Casualty Ins. Co.* (1972), 32 Ohio App. 2d 178 [61 O.O.2d 200], stated at 184-185 that:

"We adopt the argument as propounded by the plaintiff that the word 'occurrence' is much broader than the term 'accident.' Such proposition is well stated in *Aerial Agricultural Service* v. *Till* (N.D. Miss. 1962), 207 F. Supp. 50, 57:

" 'To begin with, the word "occurrence," to the lay mind, as well as to the judicial mind, has a meaning much broader than the word "accident." As these words are generally understood, accident means something that must have come about or happened in a certain way, while occurrence means something that happened or came about in any way. Thus *accident* is a special type of *occurrence,* but occurrence goes beyond such special confines and, while including accident, it encompasses many other situations as well.'

"We further adopt the plaintiff's proposition to the effect that while the activity which produced the alleged damage may be fully intended, and the residual results fully known, the damage itself may be completely unexpected and unintended.

"As an example, the plaintiff Grand River was certainly aware of its particular manufacturing activity, and was undoubtedly aware of the residual emission of smoke, dust, etc., but yet it is quite questionable whether Grand River expected or intended the damaging results to the property owners, at least in the sense that the policy uses such terms.

"Also, we think it better not to interpret the word 'occurrence' in a sudden or momentary sense, but permit such term to encompass a period of time. Such, we feel, is in keeping with the words 'including injurious exposure to conditions' as specifically used in the present policy."

Similarly, in *Portaro* v. *American Guarantee & Liability Ins. Co.* (N.D. Ohio 1962), 210 F. Supp. 411, at 415, we find:

"In common speech 'occurrence' is synonymous with event and applies literally to anything that happens or occurs. * * *"

We are of the opinion that, for purposes of determining Buckeye's duty to defend, the allegations of the complaint sufficiently state an occurrence and/or accident within the meaning of the policy. Surely, the "releases and threatened releases" of hazardous waste materials alleged in the complaint are "occurrences" within the common understanding of that term. Furthermore, we conclude that such releases of chemical substances into the environment were neither expected nor intended by Liberty Solvents. The trial court's interpretation of the definition of the term "occurrence" was unduly narrow and restrictive. Courts and commentators alike are in agreement that the term "occurrence" is to be broadly and liberally construed in favor of extending coverage to the insured. See, *e.g.*, 2 Long, Law of Liability Insurance (1983), Sections 11.05 and 11.05A, and cases cited therein.

Accordingly, we find that the release of chemical pollutants which caused the damages alleged in the complaint is an occurrence for which coverage may be afforded under the policy.

In addition to finding no occurrence, the trial court also denied coverage on the basis of Exclusion (f), the so-called Polluters Exclusion Clause. The exclusion states that:

"This Insurance does not apply:

"* * *

"(f) to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants, or pollutants into or upon land, the atmosphere or any water course or body of water; *but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental;"* (Emphasis added).

Thus, under this exclusion, damages caused by pollution are excluded from coverage unless the pollution is "sudden and accidental." The trial court found that the releases alleged in the complaint were not sudden and accidental. We disagree. Policy provisions which exclude coverage are to be strictly construed against the insurer where the language is ambiguous. *Munchick* v. *Fidelity & Casualty Co., supra.* In the case of *Home Indemnity Co.* v. *Plymouth* (1945), 146 Ohio St. 96 [32 O.O. 30], paragraph two of the syllabus, the court stated:

"Where exceptions, qualifications or exemptions are introduced into an insurance contract, a general presumption arises to the effect that that which is not *clearly excluded* from the operation of such contract is included in the operation thereof." (Emphasis added.)

Construction of the polluters exclusion clause appears to be a question of first impression in this state. However, the overwhelming authority from other jurisdictions which have been presented with the question leads us to conclude that the trial court erred in finding that the pollution-causing releases of hazardous substances alleged in the complaint could not have been sudden and accidental. We note first that the terms "sudden and accidental" are not defined in the policy of insurance. This fact alone has caused several courts to find the polluters exclusion clause to be ambiguous. In *Lansco, Inc.* v. *Dept. of Environmental Protection* (1975), 138 N.J. Super. 275, 282, 350 A. 2d 520, 524, the court interpreted "sudden and accidental" as follows:

" ' Sudden' means happening without previous notice or on very brief notice; unforeseen; unexpected; unprepared for. *Webster's New International Dictionary* (2 ed. unabridged 1954); *Black's Law Dictionary* (4 ed. 1968). 'Accidental' is defined as happening unexpectedly or by chance; taking place not according to usual course.

*Webster's New International Dictionary,* and *Black's Law Dictionary, supra; Furr* v. *Metropolitan Life Ins. Co.,* 111 N.J. Super. 596, 600, 270 A. 2d 69 (Law Div. 1970); see *Linden Motor Freight Co.* v. *Travelers Ins. Co.,* 40 N.J. 511 [193 A.2d 217] (1963). Further, under the definition of 'occurrence' contained in the policy, whether the occurrence is accidental must be viewed from the standpoint of the insured, and since the oil spill was neither expected nor intended by Lansco, it follows that the spill was sudden and accidental under the exclusion clause even if caused by the deliberate act of a third party."

Likewise, in *Jackson Twp. Municipal Utilities Auth.* v. *Hartford Accident & Indemnity Co.* (1982), 186 N.J. Super. 156, 162-164, 451 A. 2d 990, 993-994, the court stated:

"The pollution exclusion clause has been the subject of significant judicial holdings and comments in other jurisdictions. In *Molton, Allen and Williams, Inc.* v. *St. Paul F. & M. Ins.,* 347 So. 2d 95 (1977), the Alabama Supreme Court noted that St. Paul's exclusion clause was the same as found in Standard Provisions for General Liability Insurance. See 3 *Long, Law of Liability Insurance,* App. 30, App. 58 and App. 68 (1936). The comment made by Long regarding the clause states:

" ['Pollution: Exclusion (f) is new. It eliminates coverage for damages arising out of pollution or contamination, where such damages appear to be expected or intended on the part of the insured and hence are excluded by definition of 'occurrence.' * * *.[']

"Thus, almost unanimously, the courts in other jurisdictions go one step beyond *Lansco, Inc.* v. *Environmental Protec. Dep't, supra,* in finding that the pollution clause is ambiguous. In *Lansco* the occurrence was sudden and accidental because the event was unexpected, whereas in each of the other cases the court held the occurrence to be sudden

and accidental because the result or injury was unexpected or unintended.

"When viewed in light of the case law cited, the clause can be interpreted as simply a restatement of the definition of 'occurrence' — that is, that the policy will cover claims where the injury was 'neither expected nor intended.' It is a reaffirmation of the principle that coverage will not be provided for intended results of intentional acts but will be provided for the unintended results of an intentional act."

In *Jackson,* the municipality was charged with negligently polluting and contaminating groundwater by depositing dangerous toxic wastes into the municipal landfill. It was alleged that the liquid wastes seeped through the soil and into the groundwater, thereby contaminating the neighboring residential wells. The municipality's insurer refused to defend the action on the basis of the polluters exclusion clause. The court found that the insurer must defend the action and held:

"* * * The chemical manufacturer or industrial enterprise who discharges, disburses or deposits hazardous waste material knowing, or who may have been expected to know, that it would pollute, will be excluded from coverage by the clause. The industry, for example, which is put on notice that its emissions are a potential hazard to the environment and who continues those emissions is an active polluter excluded from coverage. A municipal utilities authority, in the collection of liquid waste and the deposit of the waste in a township landfill, designated as authorized to accept the waste, is carrying out its public function. Viewed from the standpoint of the municipal utilities authority, the function of depositing the waste may have been intentional but it was never expected or intended that the waste would seep into the aquifer resulting in damage and injury to others. * * * An ambiguity thus exists. Alternative

language in the clause to indicate that the act of depositing, if intentional, would exclude coverage regardless of whether the pollution is expected or intended, would have put the matter beyond reasonable question. * * *

"* * * If the inquiry is, as it should be, whether the pleadings charged the insured with an act resulting in unintended or unexpected damage, then the act or acts are sudden and accidental regardless of how many deposits or dispersals may have occurred, and although the permeation of pollution into the groundwater may have been gradual rather than sudden, the behavior of the pollutants as they seeped into the aquifer is irrelevant if the permeation was unexpected. *See Travelers Indem. Co.* v. *Dingwell*, 414 A. 2d 220 (Me. Sup. Jud. Ct. 1980). As the court stated in *Allstate Ins. Co.* v. *Klock Oil Co.*, [(1980), 73 App. Div. 2d 486, 426 N.Y.Supp. 2d 603], *supra*:

"[']Also the word "sudden" as used in liability insurance need not be limited to an instantaneous happening. (*McGroarty* v. *Great American Ins. Co.*, 43 A.D. 2d 368, 351 N.Y.S. 2d 428, aff'd 36 N.Y. 2d 358, 368 N.Y.S. 2d 485, 329 N.E. 2d 172). The term "sudden and accidental" must be construed in its relevant context. The relevant context to be considered is the fact that it is a term employed by an insurer in the contract and should be given the construction most favorable to the insured. Thus, regardless of the initial intent or lack thereof as it relates to causation, or the period of time involved, if the resulting damage could be viewed as unintended by the factfinder, the total situation could be found to constitute an accident * * * [426 N.Y.Supp. 2d at 605].[']" *Jackson Twp.*, *supra*, at 164-165, 451 A. 2d at 994-995.

There are no allegations in the complaint that compel the conclusion that Liberty Solvents intended or expected the releases of hazardous waste substances by Chem-Dyne or the damages that such releases would cause. Construing the words "sudden and accidental" most favorably to the insured and in accordance with the interpretation afforded to the polluters exclusion clause by other jurisdictions, we conclude that the release and resultant property damages could be found to be "sudden and accidental" from the standpoint of Liberty Solvents. See, also, *Niagara County* v. *Utica Mut. Ins. Co.* (1980), 80 App. Div. 2d 415, 439 N.Y.Supp. 2d 538; *Autotronic Systems, Inc.* v. *Aetna Life & Casualty* (1982), 89 App. Div. 2d 401, 456 N.Y.Supp. 2d 504; *United Pacific Ins. Co.* v. *Van's Westlake Union, Inc.* (1983), 34 Wash. App. 708, 664 P. 2d 1262; and *Travelers Indemnity Co.* v. *Dingwell* (Me. 1980), 414 A. 2d 220.

Although not addressed by the trial court, Buckeye also claims that coverage is excluded by the "Completed Operations Hazard and Products Hazard" exclusionary endorsement in the policy. Form G304 of the policy reflects that liability coverage for "Completed Operations Hazard and Products Hazard" was marked as excluded and no premium was paid therefore. Form G304 states that:

"It is agreed that such insurance as is afforded Property Damage Liability Coverage does not apply to bodily injury or property damage included within the Complete Operations Hazard or the Products Hazard."

According to the definitions set forth in the policy:

" 'completed operation hazard' includes bodily injury and property damage arising out of operations or reliance upon a representation or warranty made at any time with respect thereto, but only if the bodily injury or property damage occurs after such operations have been completed or abandoned and occurs away from premises owned by or rented to the named insured. 'Operations' include materials,

parts or equipment furnished in connection therewith. * * *"

We think it fairly obvious that the "completed operations hazard" exclusion has no applicability to the facts of this case. The commentators are in complete agreement that this exclusion is meant as a limitation on coverage for accidents due to defective workmanship occurring after the completion of work by the insured on a construction or service contract.

We likewise find that the "Products Hazard" exclusion does not clearly exclude coverage. "Products hazard" is defined by the policy as follows:

" 'products hazard' includes bodily injury and property damage arising out of the named insured's products or reliance upon a representation or warranty made at any time with respect thereto, but only if the bodily injury or property damage occurs away from premises owned by or rented to the named insured and after physical possession of such products has been relinquished to others."

Products hazard protection is synonymous with products liability protection. It provides coverage to manufacturers, producers, vendors, and others engaged in the sale and distribution of goods and products against liability for damages caused by reason of a defect in such goods or products, or improper workmanship. 12 Couch on Insurance 2d (Rev. Ed. 1981) 73-101, Sections 44A:49-44A:62; 7A Appleman, Insurance Law and Practice (Berdal Ed. 1979), Section 4508.01 et seq.; 2 Long, Law of Liability Insurance (1983), Section 11.01 et seq.

The effect of a product hazard exclusion in a policy of liability insurance is to relieve the insurer of the duty to defend and indemnify its insureds in actions charging strict liability, negligence or breach of warranty. Thus, in accordance with established principles of products liability, there must be a defective condi-

tion in the product itself which proximately causes the damage before the product hazard exclusion will preclude coverage. Cooling v. United States Fidelity & Guaranty Co. (La. App. 1972), 269 So. 2d 294; Employers' Liability Assur. Corp., Ltd. v. Youghiogheny & Ohio Coal Co. (C.A. 8, 1954), 214 F. 2d 418; and Lessak v. Metropolitan Casualty Ins. Co. of New York (1958), 168 Ohio St. 153 [5 O.O.2d 442].

This defective condition may be a design defect in the product; a manufacturing defect in the product; or in the case of an inherently dangerous or unavoidably unsafe product, a failure to provide adequate warnings. 63 American Jurisprudence 2d (1984) 229, Products Liability, Section 224. None of these conditions is present in the instant case. Unlike products liability, proof of liability under the Superfund Act requires no proof of a defective condition. Liability under the Act, although based upon strict liability, is not based upon the principles of strict products liability. If Liberty Solvents' liability is predicated upon the provisions of the Superfund Act, such liability will arise not by reason of a defective condition in the product, but by reason of Liberty Solvents' status under the Act as a generator of hazardous waste products. Moreover, products liability requires proof of causation. In order to establish products liability, the defective condition, i.e., design defect, manufacturing defect,, or failure to warn, must be the proximate or legal cause of the damages. Unless it is shown that the damages were caused by the insured's product, products liability principles, and therefore, the products hazard exclusion, does not apply to exclude coverage.

While the allegations of the complaint do not per se preclude proof of facts which would bring this case within the products hazard exclusions, it ap-

pears that the central theme of the complaint is that the property damages were caused by the negligent mishandling of the waste product by Chem-Dyne, not by any defective condition in the product itself.

Accordingly, we find that the products hazard exclusion does not necessarily negate coverage under the allegations set forth in the complaint. Since there is a theory of recovery which may potentially fall within the policy coverage, Buckeye has an obligation to defend Liberty Solvents.

The trial court erred both in granting Buckeye's motion for summary judgment and overruling Liberty Solvents' motion for partial summary judgment.

The judgment is reversed and the cause remanded.

*Judgment reversed
and cause remanded.*

BAIRD, P.J., and MAHONEY, J., concur.