PEPPER'S STEEL & ALLOYS, INC.,
and Norton Bloom, Plaintiffs,

v.

UNITED STATES FIDELITY AND
GUARANTY COMPANY; Transportation Insurance Company; Continental
Casualty Company; and the Home Insurance Company, Defendants.

No. 86–1531–CIV.

United States District Court,
S.D. Florida,
Miami Division.

Aug. 12, 1987.

R. Hugh Lumpkin, Michael P. Gable, of Keith, Mack, Lewis & Allison, Miami, Fla., for plaintiffs.

Steven Berger, Miami, Fla., for Transportation Ins. Co. & Continental Cas. Co.

Richard Critchlow & Landon Clayman, Miami, Fla., for Home Ins. Co.

Richard L. Wassenberg, Miami, Fla., for U.S. Fidelity and Guar. Co.

SPELLMAN, District Judge.

THIS CAUSE comes before the Court on Plaintiffs', PEPPER'S STEEL & ALLOYS, INC, and NORTON BLOOM, Motion for Summary Judgment and on Defendants', UNITED STATES FIDELITY AND GUARANTY COMPANY and THE HOME INSURANCE COMPANY, Motions to Dismiss. The questions presented are: (1) whether Florida Statute Annotated § 627.-426(2) (West 1984) precludes any Defendants from raising defenses regarding their duty to defend and/or provide coverage/indemnification to the Plaintiffs, their insureds, in actions brought against the Plaintiffs by the State of Florida, Department of Environmental Regulation ("DER") and the United States of America, Environmental Protection Agency ("EPA"); and (2) whether, notwithstanding the statute, the Defendants owe the Plaintiffs a duty to defend them in those underlying actions. Because this court is of the opinion that the statute has either been complied with by some Defendants or is not applicable to those Defendants which are excess carriers without any duty to defend, this Court DENIES Plaintiffs' Motion for Summary Judgment on that issue. This Court is also of the opinion that no exclusion within any of the policies at issue in this case abrogates a primary carrier's duty to defend the Plaintiffs, and therefore GRANTS Plaintiffs' Motion for Partial Summary Judgment on the question of the Defendants' duty to defend. Accordingly it DENIES Defendant's, United States Fidelity and Guaranty Company, Motion to Dismiss, insofar as that motion argues that this Defendant has no duty to defend and GRANTS Defendant's, The Home Insurance Company, Motion to Dismiss, insofar as that motion argues that the statute in question is not applicable to an excess carrier without any duty to defend.

## I. *Facts*

This Court is familiar with the facts in this case and has written one memorandum opinion in the companion case of *Payne v. United States Fidelity and Guaranty Company,* 625 F.Supp. 1189 (S.D.Fla.1985). Nonetheless, a brief review is warranted.

During the period 1970–82, Defendants United States Fidelity and Guaranty Company ("USF & G") and Defendant CNA[1] issued to Plaintiff Pepper's Steel and Alloys, Inc. ("Pepper's") comprehensive general liability insurance. During the same period, CNA and The Home Insurance Company ("Home"), issued various excess and/or umbrella policies. Pepper's operated a metal recovery business of which Norton Bloom ("Bloom") was the president. Bloom also owned the property on which

---

1. During oral argument on these motions, Defendants Continental Casualty Company and Transportation Insurance Company referred to themselves collectively as "CNA."

Pepper's did some of their business. Part of Pepper's business involved the recovery of metals from transformers purchased from Florida Power and Light Company. These transformers frequently contained oil which, unbeknownst to Plaintiffs, contained potentially hazardous concentrations of polychlorinated biphenyls ("PCBs"). There is evidence in the record tending to establish that Plaintiffs knew nothing about the concentrations of PCBs until 1977. At that point they took remedial actions to prevent their spread, received a "clean bill of health" from DER and were unaware of any further problems regarding PCB concentrations until 1983. In that year DER and EPA made further investigations and, upon finding PCB contamination outside accepted threshold levels, filed suit against the Plaintiffs, identifying them as potentially responsible parties.

Plaintiffs notified these defendants of the two lawsuits and demanded a defense under the terms of the policies. In 1985, the EPA filed an additional action against Plaintiffs seeking recovery of the initial response costs incurred by the Government. Upon Defendants' refusal to provide any defense, Plaintiffs filed this action seeking a determination of the Defendants' duties and obligations under the insurance policies issued by them.

Plaintiffs' motion initially sought a determination that *all* Defendants owed them a duty of defense in the underlying actions brought by DER and EPA. Both in open court and in subsequent pleadings, however, Plaintiffs conceded that Defendants Home and CNA, to the extent they provided excess coverage, had no duty to defend. Plaintiffs still seek a declaration of the primary carriers' duty to defend, reimbursement for all costs and fees incurred to date in defending the underlying actions from the date of demand on Defendants in 1983 up to the present, together with the costs and fees incurred in bringing this action. Finally, Plaintiffs seek a determination that all Defendants are obligated to provide coverage/indemnification to them for any potential liability in the main cases based on the Defendants' statutory waiver of coverage defenses. Plaintiffs concede,

however, that should the court determine that either the statute is not applicable or has been complied with, there remain questions of fact which preclude the entry of summary judgment on the question of coverage/indemnification.

Defendant USF & G argues in its motion that at least two exclusions in the policies issued by it to Plaintiffs relieve them from providing either a defense or coverage. Defendant Home in its motion argues that as an excess carrier and under the plain terms of the policy it issued, it has no duty to defend. As indicated, this argument is conceded by Plaintiff. Home also argues that it has no obligation to provide coverage.

This court held a hearing on all motions on June 8, 1987. At the hearing it became clear that despite the various issues raised in the motions and responses thereto, there were in fact only two narrow issues before the court: the applicability of Fla.Stat.Ann. § 627.426(2) (West 1984) and its effect on the Defendants' subsequent ability to raise coverage defenses, and the Defendants' duty to otherwise provide a defense.

## II. *The Statute*

This court is of the opinion that the statute is not applicable to some Defendants and has been complied with by the others. Fla.Stat. § 627.426(2) states in pertinent part:

(2) A liability insurer shall not be permitted to deny coverage based on a particular coverage defense unless:

(a) Within 30 days after the liability insurer knew or should have known of the coverage defense, written notice of reservation of rights to assert a coverage defense is given to the named insured by registered or certified mail sent to the last known address of the insured or by hand delivery; and

(b) Within 60 days of compliance with paragraph (a) or receipt of a summons and complaint naming the insured as a defendant, whichever is later, but in no case later than 30 days before trial, the insurer:

1. Gives written notice to the named insured by registered or certified mail of its refusal to defend the insured;

2. Obtains from the insured a non-waiver agreement following full disclosure of the specific facts and policy provisions upon which the coverage defense is asserted and the duties, obligations, and liabilities of the insurer during and following the pendency of the subject litigation; or

3. Retains independent counsel which is mutually agreeable to the parties. Reasonable fees for the counsel may be agreed upon between the parties or, if no agreement is reached, shall be set by the court.

Fla.Stat.Ann. § 627.426(2) (West 1984).

■ Defendant Home, as an excess carrier with no duty to defend, and also Defendant CNA, to the extent it is an excess carrier with no duty to defend, argue that this section of the statute is not applicable to them and that they cannot be said to have waived any right to assert coverage defenses predicated on an alleged failure to comply with it. In particular, Home argues that § 627.426(2)(b) deals exclusively with arrangements concerning defense of the insured, retention of independent counsel, and delineations of the duties and obligations in relation to pending litigation. Home also argues that the statute is designed to address problems arising from disputes regarding whether, how and under what circumstances and conditions a defense will be provided for an insured pursuant to a defense provision of an insurance contract, and is therefore not applicable to them. This court agrees and notes that Plaintiffs' counsel, when asked at the hearing in this case whether it could seriously contest the position taken by the Home, responded in the negative.

■ At the hearing, Defendants USF & G and CNA, to the extent each is a primary carrier, argued to the Court that they substantially complied with the statute, insofar as Plaintiffs were on actual notice of these Defendants' positions, albeit not in accordance with the technical "niceties" subsection (2)(b) of the statute requires. And,

Plaintiffs' counsel conceded that they were on actual notice of the Defendants' positions regarding any defense by virtue of their conduct in the pending state court litigation involving similar issues, and had no reason to believe that the Defendants would do otherwise in this federal action. Without defining the outer parameters of the statute, and while recognizing that at least one court addressing the statute has strictly construed it, *Auto Owners Insurance Co. v. Salvia*, 472 So.2d 486 (Fla.Dist. Ct.App.1985), this Court holds that, on the facts of this case, where Plaintiffs concede actual notice within the meaning of the statute although not in strict compliance with it, it has been complied with. Insofar as the Plaintiffs were on actual notice, this Court feels comfortable that its decision comports with due process and that the legislative intent embodied in the notice requirements of the statute has been effectuated.

In the event this Court found the statute to be inapplicable or complied with, Plaintiffs conceded that there remain questions of fact precluding the entry of summary judgment on the question of coverage/indemnification. Awaiting any determination on the coverage question until after resolution of the underlying casualty claims is, in this Court's opinion, the more prudent avenue in any event. Accordingly, the Court will address solely the question of the Defendants' duty to defend and all other issues regarding coverage are declared MOOT. For the following reasons, the Court is of the opinion that, on the facts of this case, the Defendants are obligated to provide Plaintiffs with a defense.

### III. *Duty of Defense*

a) *Law Governing:*

Before the Court is the construction and effect of a written contract, which is a matter of law to be determined by the Court. *Payne*, 625 F.Supp. at 1191 (citing *St. Paul Mercury Ins. Co. v. Huitt*, 336 F.2d 37 (6th Cir.1964)). Since the jurisdiction of this Court is based on diversity and since the insurance contracts were issued in Florida, this Court must look to Florida law in interpreting the policies where such

law exists. *Payne,* 625 F.Supp. at 1191. The Defendants' duty to defend rests entirely upon the meaning of the provisions of the policies and their legal effect. Such a determination is most appropriate for summary judgment. *Id.*

There is no question but that an insurer's duty to defend an insured is broader than the duty to indemnify. In this regard:

> The duty of the insurer to defend the insured depends upon the allegations in the complaint of the third party in his or her action against the insured. This duty is not limited to meritorious suits and may even extend to actions which are groundless, false or fraudulent, so long as the allegations against the insured *even arguably* come within the policy coverage. An insurer has a duty to defend, despite theories of liability asserted against any insured which are not covered under the policy, if there are any theories of recovery that fall within the policy. The duty to defend cannot be limited by the precise language of the pleadings. The insurer has the duty to look behind the third party's allegations to analyze whether coverage is possible. In a case of doubt as to whether or not the complaint against the insured alleges a liability of the insurer under the policy, the doubt must be resolved in the insured's favor.

*Jonesville Products, Inc. v. Transamerica Ins. Group,* 156 Mich.App. 508, 402 N.W.2d 46, 47 (Mich.Ct.App.1986) (quoting *Detroit Edison Co. v. Michigan Mut. Ins. Co.,* 102 Mich.App. 136, 301 N.W.2d 832, 835 (Mich. Ct.App.1980) (citations omitted) (emphasis in original). One Florida court has stated it this way:

> The duty to defend is distinct from and broader than the duty to indemnify the insured against damages assessed, and if the complaint alleges facts showing two or more grounds for liability, one being within the insurance coverage and the other not, the insurer is obligated to defend the entire suit.

*Baron Oil Co. v. Nationwide Mut. Fire Ins.,* 470 So.2d 810, 813–14 (Fla.Dist.Ct. App.1985). *Accord National Grange Mut. Ins. Co. v. Continental Casualty Co.,* 650 F.Supp. 1404, 1407–8 (S.D.N.Y.1986) (insurer's duty to defend is separate and distinct from the duty to indemnify ... the former is contractual and is heavier than the latter ... the insurer is required to provide a defense to any action, however groundless, in which there exists any possibility that the insured might be held liable for damages where facts are alleged within the coverage of the policy); *Niagara County v. Utica Mut. Ins. Co.,* 103 Misc.2d 814, 427 N.Y.S.2d 171, 175 (1980).

Again, any doubt regarding the duty to defend must be resolved in favor of the insured. *Baron Oil,* 470 So.2d at 814; *Florida Ins. Guar. Assoc. v. Giordano,* 485 So.2d 453, 456 (Fla.Dist.Ct.App.1986). *Accord Continental Casualty Co. v. Cole,* 809 F.2d 891, 895 (D.C.Cir.1987) (insurer's duty to defend hinges on allegations against the insured and any doubt as to whether a cause of action falls within the terms of the policy must be resolved in insured's favor).

Additionally,

> [t]he law in Florida is well-settled that a contract of insurance prepared by an insurance company must be construed liberally in favor of the insured and strictly against the insurance carrier. Where the terms of an insurance contract are susceptible of two reasonable constructions, that interpretation which will sustain coverage for the insured will be adopted. In particular, exclusionary clauses in insurance contracts must be construed liberally against the insurance company and in favor of the insured in order that the purpose of insurance will not be defeated.

*Tropical Park, Inc. v. United States Fidelity and Guar. Co.,* 357 So.2d 253, 256 (Fla.Dist.Ct.App.1978) (citations omitted).

In determining whether the duty to defend arises, the Court must look to the allegations in the underlying complaint[2]

---

**2.** The following allegations of the underlying Complaints filed by DER and EPA against the Plaintiffs are relevant to this Court's inquiry: *1983* EPA *Action:*

4. Pepper Steel and Alloy, Inc. ("Pepper") is a corporation organized and existing under the laws of the State of Florida, with its principal place of business at the site. Pepper leases the portion of the site owned by Bloom.

9. Defendant Pepper has been engaged at the site since the early 1970's in a scrap metal and recovery operation which involves, *inter alia,* the recycling of transformers and other electrical equipment.

10. Defendant Norton Bloom is President of Pepper.

11. Defendant Pepper drained or caused to be drained large quantities of transformer oil containing PCBs indiscriminantly at the site and the other defendants permitted this activity.

13. In February 1975, a Dade County Department of Environmental Sources Management ("DERM") inspector observed an area of oil-soaked ground at the site and took samples that were analyzed for hydrocarbons. Results showed 68,700 mg/1 of oil and grease. No other analyses were conducted on this sample. Since that time, soil, groundwater and oil samples have been taken on several occasions by consultants retained by Defendant Norton Bloom and by DERM officials, and have been tested for PCBs. Data from these samples indicate the presence of PCBs in the soil and water at various levels.

14. In December, 1982, DERM observed an oily layer in each of six pits dug at the site to a depth of two to four feet. The oil layers ranged from 6 to 12 inches in thickness. Analyses of the oil revealed PCB concentrations up to 2100 mg/kg.

20. Despite receiving notice from EPA of the release of the PCBs, the Defendants have not undertaken an effort to control or contain the spread of PCBs at the site.

33. Defendant Pepper has caused PCBs, a hazardous substance, to be released into the environment at the site, and the other defendants have permitted such releases to occur.

*1983 DER Action:*

4. Pepper's Steel and Alloys, Inc. (Pepper's Steel), a Florida Corporation, has been the operator of a scrap metal recovery facility in Medley, Florida since the late 1960's or the early 1970's. A portion of Pepper's Steel's business has been the recovery and resale of metals from transformers and other electrical equipment which was sold to Pepper's Steel by Florida Power and Light Company.

5. Florida Power and Light Company (FPL), a Florida corporation, is a public utility engaged in the provision of electrical power to the residents of Florida. Since the late 1960's or the early 1970's, FPL has had a contract with Pepper's Steel for the disposal of scrap FPL transformers and electrical equipment.

6. Norton Bloom is the President and Registered Agent of Pepper's Steel and Alloys, Inc., and is the owner of the property on which Pepper's Steel has principally conducted its operations since the early 1970's. The property is approximately 10 acres in size, and is more specifically described as Tract 44, Section 33, Township 52 South, Range 40 East, Sub of Plat Book 2, at Page 17, Folio No. 22 2033 01 0530 6, Dade County, Florida. This property will be referred to in this Complaint as "the Bloom property." Norton Bloom exercised direct supervision over the daily operations of Pepper's Steel, including the dumping of transformer oil laden with polychlorinated biphenyls (PCB's) on the Bloom property and adjacent properties. Norton Bloom is sued both individually and as a corporate officer of Pepper's Steel and Alloys, Inc.

19. Pepper's Steel processed transformers which it received from FPL in order to recover valuable copper and aluminum and other metals. To accomplish this recovery, Pepper's Steel employees, at Norton Bloom's direction, opened the transformers and dumped PCB-laden transformer oil which was inside onto the open ground on the Bloom property and, with the owners' consent, on the Payne and Curtis properties. The PCB-laden oil percolated through the soil to the groundwater table which lies two to three feet beneath the surface. The oil has super-saturated the soil, and an oil slick one to three inches thick floats on the groundwater when a hole is dug down to the water table. Significant concentrations of PCBs have been found in the soil on the Bloom, Payne, and Curtis properties. PCBs have also been detected in the groundwater beneath the properties and in water from a well located south of the Bloom property.

31. FPL, Pepper's Steel, and the Owner Defendants have each caused and contributed to and are causing and contributing to the actual contamination of the soil on and the groundwater underlying the Owner Defendants' properties and the threatened contamination of other soil, ground water, and surface waters.

59. Pepper's Steel and the Owner Defendants have violated Florida Administrative Code Rules 17–3.402 and 17–3.245 by introducing PCB's into the groundwater, and have violated Florida Administrative Code Rule 17–4.245 by failing to submit a groundwater monitoring plan.

63. Pepper's Steel and the Owner Defendants have caused pollution by the uncontrolled release of transformer oil and PCB's onto their property and into the groundwater flowing beneath it. This pollution has harmed or injured human health or welfare, animal and plant life, and property. In accordance with Section 403.141, Florida Statutes, Pepper's Steel and the Owner Defendants are therefore liable for the judicial imposition of a civil penalty of not more than $10,000 per day for each day of violation of Department rules.

*1985 EPA Action:*

4. Defendant Pepper's Steel and Alloy, Inc. (hereafter "Pepper's Steel") is a former Florida Corporation which did business at the site

and compare those with the provisions of the policies.[3] *Baron Oil*, 370 So.2d at 813; *National Grange*, 650 F.Supp. at 1408. And, as the court in *National Grange* stated:

as long as the claim asserted against the insured may rationally be said to fall within the policy coverage, whatever may be the limits of the insurers' responsibility to pay, it is obligated to defend. Even if some of the allegations of the underlying complaint are clearly outside the scope of the coverage contained in the policy, the insurer is obligated to defend unless the allegations as a whole preclude coverage.

*National Grange*, 650 F.Supp. at 1408. *See also Waste Management v. Peerless Ins. Co.*, 315 N.C. 688, 340 S.E.2d 374, 377 (N.C.1986) (where the insurer knows or could reasonably ascertain facts that, if proven, would be covered by its policy, the

until involuntarily dissolved in 1983. The corporation continues to exist for purposes of this action pursuant to Fla.Stat. § 607.297.

6. Defendants Norton Bloom, Thomas Curtis, William Payne, Flora Payne, and Lowell Payne are the owners of portions of the land which comprises the site. From the 1960's until recently, Pepper's Steel was allowed by lease or otherwise to use the properties owned by these defendants in its scrap metal and transformer salvage business. In addition to being part owner of the site property, defendant Bloom owned and operated Pepper's Steel and Alloys, Inc.

7. The Pepper's Steel site is marsh land which has been filled with scrap metal and debris. The site and surrounding area is underlain by the Biscayne Aquifer—the primary drinking water source for all of Southeast Florida, supplying approximately 500 million gallons of water each day. The Miami Canal, which runs adjacent to the site, is a recharge zone for the Biscayne Aquifer.

8. In the mid 1960's, Pepper's Steel, by and through Norton Bloom, began a scrap metal recovery business on the site. In the late 1960's Pepper's Steel expanded its business to include reclamation of transformers generated by defendant FP & L. Pepper's Steel would transport the FP & L transformers to the site, and, upon receipt of the discarded transformers at the site, would break them open and remove the salvagable metals from within. The unsalvagable parts of the transformers were then discarded. The transformers contained an average of thirty to forty gallons of transformer oil contaminated with polychlorinated biphenyls ("PCBs"), a hazardous substance under CERCLA. In opening the transformers and haphazardly discarding the unsalvagable parts, the PCB laden oil inside the transformers was spilled and otherwise discharged directly onto the surface of the site.

9. Pepper's Steel continued to operate its transformer reclamation business at the site until at least 1981. From the late 1960's until the cessation of transformer reclamation activities, Pepper's Steel reclaimed an average of at least 10,000 to 15,000 FP & L transformers each year. Much of the PCB laden oil contained in these transformers was spilled or otherwise discharged directly onto the surface of the Pepper's Steel site.

3. The following provisions of the various policies issued by the Defendants are at issue in this case:

COVERAGE:

The Company will pay on behalf of the INSURED all sums which the INSURED shall become legally obligated to pay as DAMAGES because of

A. BODILY INJURY or
B. PROPERTY DAMAGE

to which this insurance applies, caused by an OCCURRENCE, and the Company shall have the right and duty to defend any suit against the INSURED seeking DAMAGES on account of such BODILY INJURY or PROPERTY DAMAGE, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, but *the Company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the Company's liability has been exhausted by payment of judgments or settlements.*

OCCURRENCE:

means an accident, including injurious exposure to conditions, which results, during the policy period, in BODILY INJURY or PROPERTY DAMAGE neither expected nor intended from the standpoint of the INSURED; ...

EXCLUSIONS: The policy does not apply to
a) BODILY INJURY or PROPERTY DAMAGE arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any watercourse or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.
b) PROPERTY DAMAGE to
   (1) property owned or occupied by or rented to the INSURED,
   (2) property used by the INSURED, or
   (3) property in the care, custody or control of the INSURED or as to which the INSURED is for any purpose exercising physical control;
   ...

duty to defend is not dismissed because the facts alleged in a third-party complaint appear to be outside coverage, or within a policy exception to coverage).

b) *Analysis:*

i. *Occurrence:*

Defendants first argue that no "occurrence" has been realized on the facts of this case. This Court disagrees. Whether there has been an occurrence is a question that must be looked at from the insureds' point of view. *Buckeye Union Ins. Co. v. Liberty Solvents & Chemicals Co., Inc.,* 17 Ohio App.3d 127, 477 N.E.2d 1227, 1233 (Ohio Ct.App.1984); *accord Peerless,* 340 S.E.2d at 379 (the definition of "occurrence" and its description as an "accident" significantly restrict "occurrences" to events that are unexpected and unintended as viewed from the standpoint of the insured). And this Court agrees "that the term 'occurrence' is to be broadly and liberally construed in favor of extending coverage to the insured." *Buckeye,* 477 N.E.2d at 1233. *See generally Grand River Lime Co. v. Ohio Casualty Ins. Co.,* 32 Ohio App.2d 178, 289 N.E.2d 360, 364–65 (Ohio Ct.App.1972) (excellent discussion regarding what this court considers to be the proper interpretation of the term "occurrence").

■ At oral argument, Defendant USF & G defined an "occurrence" as an accident, but argued to this Court that an "accident" was not the natural and probable result of an insureds' business activities. This has only confirmed to this Court that an occurrence has been realized. From the insureds' point of view, the release of PCBs into the environment was not the natural and probable result of their business activities. Plaintiffs are in the business of recovering scrap metals, not disposing of toxic wastes. The release of PCBs into south Florida's aquifer underlying Plaintiffs' own property and the property of adjoining landowners was undoubtedly the unexpected or unintended result of the intentional acts which comprised their business' daily operations. Such an event is an "occurrence."

Significantly, most courts addressing this issue, including this one, have found a polluting event to be an "occurrence" within the meaning of these policies. *Payne,* 625 F.Supp. 1189; *Jackson Township Mun. Util. Auth. v. Hartford Accident & Indem. Co.,* 186 N.J.Super. 156, 451 A.2d 990 (N.J.Super.Ct.Law Div.1982); *Allstate Ins. Co. v. Klock Oil Co.,* 73 A.D.2d 486, 426 N.Y.S.2d 603 (N.Y.App.Div.1980); *Fireman's Fund Ins. Co. v. Ex-Cell-O Corp.,* 662 F.Supp. 71 (E.D.Mich.1987). This is especially so where the action, as here, is brought pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C.A. §§ 9601 *et seq.* (West 1983) ("CERCLA"). *Buckeye,* 477 N.E.2d 1227, 1232–33. As the court in *Buckeye* stated:

> Liability under [CERCLA] is predicated upon one's status as a responsible person, *i.e.,* a generator, a transporter, or a disposer of hazardous wastes. [Plaintiffs are] subjected to potential liability under [CERCLA] simply because of [their] status.... This potential liability ... establishes [an insurer's] duty to defend ... unless there is a provision in the policy which clearly and unambiguously excludes coverage.

*Id.* at 1232. This court agrees.

ii. *Pollution Exclusion Clause:*

■ Next, Defendants argue that the pollution exclusion clause in any one policy precludes them from providing a defense. Contrary to what the Defendants argue, this issue has already been addressed by this Court in the companion case of *Payne.* The clause by its own terms is not applicable where the "discharge" etc. of pollutants is "sudden and accidental."

Defendants USF & G and CNA argue that because the principal reason the Plaintiffs are being sued by DER and EPA is because of their being active polluters, the pollution caused was neither sudden nor accidental, rendering the clause applicable. The Defendants attempt to distinguish *Payne* on the grounds that it was decided on the basis of the absence of any allegations against Payne that he was causing

the pollution as a natural and usual part of his business and that the opposite is the case regarding these Plaintiffs.

This Court disagrees. In addressing the term "sudden and accidental," this Court has already accepted the proposition that where a spill or release of chemical substances, in this case the release of PCBs into the aquifer beneath the site, is neither expected nor intended from the insured's point of view, it follows that it was "sudden and accidental." *Payne*, 625 F.Supp. at 1192–93. *Payne* relied on *Lansco, Inc. v. Dept. of Environmental Protection*, 138 N.J.Super. 275, 350 A.2d 520 (N.J.Super.Ct. Ch.Div.1975) and *Buckeye*, and today the Court is still of the opinion that insofar as the pollution exclusion clause is concerned, that reasoning is fully applicable here. *Accord Ex-Cell-O*, 662 F.Supp. at 75–76 (regarding this pollution exclusion clause, the decisive inquiry is not whether the policyholders anticipated property damage, or whether they regularly disposed of hazardous waste, but whether the pollutants entered the environment unexpectedly and unintentionally).

Looking at the situation from the Plaintiffs' point of view, this Court is convinced that they are not "active polluters," and there is no suggestion of such in the underlying complaints. This Court, after being familiar with the underlying facts surrounding this case for well close to four years now and after hearing oral argument by the parties, is convinced that the Plaintiffs did not know of the release of PCBs into the environment and are in fact overwhelmed by the potential liability they face.

A comparison of the allegations in the underlying complaints with the policy provisions supports this conclusion. At their worst, the complaints allege that Plaintiffs "indiscriminantly" dumped oil and "caused" the release. Yet glaringly absent are any allegations that Plaintiffs knew that PCBs were being released into the environment, so as to truly make them "active" polluters. Plaintiffs intentionally caused the dumping of oil, but the release of PCBs into the aquifer was, as indicated earlier, an unintended result from the Plaintiffs' point of view. Under no complaint is it alleged that Plaintiffs knew the transformer oil contained PCBs, or that the Plaintiffs were the originators of the PCBs or knowingly caused their spread as a natural part of their daily business operations. Accordingly, it cannot seriously be contended that Plaintiffs expected or intended the release of PCBs into the environment.

Given the policy provisions, the Defendants during oral argument continually argued to the Court that a broad look at the allegations of the complaints was not warranted; that to do so was to in effect not let them "convict" the Plaintiffs for the "lesser included offense" when they failed to establish the elements of the major crime. In other words, the Defendants preferred to peel one layer of onion skin and place it under the microscope, while the Court preferred to look instead at the whole onion from the outside with a magnifying glass. To look at the allegations as a whole to determine whether any coverage is arguably possible is the proper route. After all,

> [w]hether [an insured] can obtain a defense from his insurer must depend not on the caprice of the third party's draftsmanship, nor the limits of his knowledge, but on a *potential* shown in the complaint that the facts ultimately proved come within the coverage. It is the *insurer's* duty to look behind the third party's allegations to analyze whether coverage is possible.

*Jonesville*, 402 N.W.2d at 48 (citations omitted) (emphasis added).

This court recognizes that there is a plethora of authority from jurisdictions throughout the United States which, depending on the facts presented and the allegations of the underlying complaints, go "both ways" on the issues presented today. The cases swim the reporters like fish in a lake. The Defendants would have this Court pull up its line with a trout on the hook, and argue that the lake is full of

trout only, when in fact the water is full of bass, salmon and sunfish too.

No *per se* rule could possibly be developed. Each case obviously will turn on its facts as they reflect on any one insured's state of mind, intent and motivation at the time complained of.

In this regard, the Court pictures a graph of sorts. On one axis is the insurer's duty to defend; on the other are the facts, including the allegations of the underlying complaints, the policy provision's language and particularly, the insured's knowledge and conduct in response to that knowledge. The greater the knowledge— scienter if you will—and the less preventative the conduct as a result, in other words, the greater an insured comes to being an "active polluter," the less an insurer comes to owing a defense. Naturally, a balancing will be involved. Absent a showing that damages were actually intended or, at a minimum, substantially forseeable, which is not the case here, the duty to defend should arise and the pollution exclusion ought not apply to abrogate this duty. Some Plaintiffs lose. These Plaintiffs, on the other hand, where there is evidence in the record that they in fact took remedial steps to prevent the spread of pollutants and received a "clean bill of health," and are truly surprised by the subsequently filed suits, win. On these facts, any other result would be punitive and, moreover, would not support the reason for which these insureds purchased insurance to begin with. *See Lansco*, 350 A.2d at 524.

### iii. *Property Damage Clause:*

■ Finally, the Defendants argue that the property damage clause in their respective contracts preclude the Plaintiffs from requiring them to provide a defense in the underlying actions brought by the DER and EPA. They argue that because Bloom was the owner of the property for which property damage is claimed and Pepper's

was leasing the property and otherwise exercising control and custody of it, that the property damage exclusion applies. This court disagrees.

This exclusion is not applicable insofar as the underlying complaints allege damage to the property of adjoining landowners and the public. In this regard, this Court holds that where the property damage alleged constitutes damage to the environment, in this case the Biscayne Aquifer and the underlying waters which are the very source of the drinking waters for much of south Florida, that such property in truth belongs not to the Plaintiffs, but rather to the State and the citizens thereof, and simply is not capable of being privately owned. *Accord United States Aviex Co. v. Travelers Insurance Co.*, 125 Mich.App. 579, 336 N.W.2d 838, 843–44 (Mich.Ct.App.1983); *Ex-Cell-O*, 662 F.Supp. at 75; *Continental Ins. Co. v. N.E. Pharm. & Chem. Co.*, 811 F.2d 1180, 1186–87 (8th Cir.1987).[4]

### IV. *Conclusion*

In conclusion, this Court agrees with the Plaintiffs that the policies herein, when compared to the underlying complaints brought against them, require the Defendants to provide a defense on the facts presented, notwithstanding the statute or any exclusions argued by the Defendants. In so holding, the Court reiterates its position that it has limited its inquiry to the question of defense, and in no way should this opinion reflect on the Defendants potential duty to provide coverage/indemnification. The Defendants owe this duty jointly and severally. Any issue raised by Plaintiffs regarding fees and costs the Defendants may be found to owe as a result of Plaintiffs having to bring this action shall be HELD IN ABEYANCE until after the underlying casualty claims have been resolved. HOWEVER, the Court hereby awards the Plaintiffs their fees and costs incurred to date in defending the underly-

---

**4.** Defendant USF & G also argues that two other exclusions preclude them from having to defend against the suits brought against the Plaintiffs

by their employees. Suffice it to say at this point that where, as here, the duty to defend

ing actions from the date of demand on Defendants in 1983 up to the present.[5]

---

arises, the insurer is obligated to defend the entire suit. *Baron Oil,* 470 So.2d at 813–14.

5. The parties shall seek to resolve this issue between themselves. In the event they can not do so, Plaintiff shall file a detailed itemized

accounting for fees and costs expended to date. Defendants shall thereafter file their objections to the same within 15 days. If necessary, the Court will resolve the issue by having an evidentiary hearing conducted.