644 So.2d 357 (1994)
SOUTH CENTRAL BELL TELEPHONE COMPANY
v.
KA-JON FOOD STORES OF LOUISIANA, INC. and Broadmoor Service Center, Inc.
No. 93-CC-2926.
Supreme Court of Louisiana.
May 24, 1994.
Rehearing Granted June 24, 1994.
Emile C. Rolfs, III, William F. Ridlon, II, Baton Rouge, for applicants.
Celia R. Cangelosi, Milton O. Walsh, Murphy J. Burke, III, Baton Rouge, Michael P. Colvin, New Orleans, Catherine S. Nobile, Frank A. Fertitta, Baton Rouge, for respondent.
Ralph S. Hubbard, III, New Orleans, Thomas W. Brunner, Laura A. Foggan, Carol A. Barthel, Washington, DC, for Insurance Environmental Litigation, amicus curiae.
Maureen N. Harbourt, Esteban Herrera, Jr., Baton Rouge, for Louisiana Chemical Ass'n, amicus curiae.
Francis S. Craig, III, Baton Rouge, Eugene R. Anderson, New York City, Martha Churchill, Chicago, IL, for Mid-America Legal Fund, amicus curiae.
ORTIQUE, Justice.[1]
The resolution of this case requires the interpretation of an "absolute" pollution exclusion endorsement to a standard commercial general liability business insurance policy.
South Central Bell (Bell) filed suit against a convenience store operator and its insurer after gasoline, which accidentally leaked from the convenience store's underground storage tanks, damaged Bell's cables. Bell's suit requests tort damages for the losses it suffered, as well as injunctive relief to abate future damages from the continued presence of the gasoline in the groundwater surrounding its cables. The convenience store's insurer filed a motion for summary judgment claiming the policy at issue expressly excludes coverage for all claimed damages and requested relief based upon its pollution exclusion. The motion was denied by the trial court which determined the exclusion applies only to active polluters, and not to those who incidentally possess a pollutant which accidentally escapes. On the insurer's application for supervisory review, the appellate court granted summary judgment finding the exclusion "clearly and unambiguously" excludes coverage. We vacate the judgment.
The pollution exclusion does not preclude coverage of the damages caused to Bell's cables. However, regarding Bell's claim for injunctive relief, genuine issues of material fact remain as to whether the exclusion can be enforced due to the circumstances surrounding its issuance. Therefore, summary judgment denying insurance coverage on that claim was improperly granted by the appellate court.

I.
Pursuant to a servitude, Bell has underground telephone cables running parallel to Florida Boulevard at Cora Drive in Baton Rouge. Defendants Broadmoor Service Center, Inc., Broadmoor Village, Inc. and/or Robert L. Cangelosi (Broadmoor), own real property where those two streets intersect. Broadmoor's tenant, Ka-Jon Food Stores of Louisiana, Inc.[2] (Ka-Jon), insured under a business policy issued by State Farm Fire and Casualty Company (State Farm), operated a convenience store at that location in September, 1986. One of the items Ka-Jon sold was gasoline, which it stored in underground storage tanks. The tanks were owned by Broadmoor. Allegedly, the underground *358 tanks leaked or discharged gasoline into the groundwater surrounding Bell's cables. The presence of the gasoline weakened the cables's plastic sheathing, permitting water to penetrate the sheathing and short out the telephone lines.
Bell filed this suit against defendants seeking both property damages and injunctive/remedial relief. It desires the injunctive/remedial relief to determine the nature and extent of the underground contamination and to require clean-up measures to abate future damages. Defendants responded by filing answers and numerous cross claims and/or third-party demands.
State Farm denied liability on the principal, third-party and cross claims, asserting that the insurance policy it issued to Ka-Jon contains an exclusion of coverage for the claimed damages. It filed a motion for summary judgment urging the policy's Pollution Exclusion Endorsement entitled it to judgment on all claims as a matter of law since the policy unequivocally excludes coverage for property damage caused by gasoline leakage with the following language: "this policy does not apply ... to any ... property damage arising out of the actual, alleged or threatened discharge, dispersal, spill, release or escape of smoke, vapors, soot, fumes acids, alkalis, toxic chemicals, liquids, gases, waste materials ..., or other irritants, contaminants or pollutants ... at or from premises, owned, rented or occupied by the named insured." It argues that, "[g]asoline ... clearly fall[s] within the exclusion, if for no other reason than it actually damaged the telephone cables in question, and is thereby, de facto, `an irritant, contaminant, or pollutant.'"
Plaintiff Bell and defendant Broadmoor opposed the motion asserting that the policy's pollution exclusion is ambiguous because it fails to state whether it applies to intentional or negligent polluting, or both. They argued the exclusion does not apply "to those who only incidentally possess the pollutant in the course of their business" like Ka-Jon, but to insureds who "wantonly" or "indifferently" pollute, citing as authority the Fourth Circuit's interpretation of an absolute pollution exclusion in West v. Board of Com'rs, 591 So.2d 1358, 1360 (La.App. 4th Cir.1991).[3] They further contended that State Farm offered no evidence to show Ka-Jon intended to pay for business insurance which omitted coverage of routine and incidental risks of its convenience store's operations.
Following a hearing, the motion for summary judgment was denied. The trial court applied West v. Board of Com'rs, supra,[4] determining the pollution exclusion applies to active polluters but not to those who incidentally possess a pollutant which accidentally escapes.
State Farm sought supervisory review and its application was granted. South Central Bell Telephone Co. v. Ka-Jon Food Stores of Louisiana, 626 So.2d 1223 (La.App. 1st Cir. 1993). The First Circuit determined the pollution exclusion "clearly and unambiguously excludes coverage for any damages to underground telephone cables due to the leakage of gasoline from underground storage tanks leased by the named insured." 626 So.2d at 1224. In rendering its decision, it expressly declined to follow the Fourth Circuit's decision in West v. Board of Com'rs, supra.[5]Id. Therefore, it entered judgment in favor of State Farm, granting its motion for summary judgment and dismissing all claims against it.
Since the decision of the First Circuit conflicts with the Fourth Circuit's decision in *359 West v. Board of Com'rs, supra,[6] we granted Bell's application for writ of certiorari. South Central Bell Telephone Co. v. Ka-Jon Food Stores of Louisiana, 93-2926 (La. 2/4/94); 633 So.2d 158 La.1994). See Rule X, § 1(a)(1). We permitted the filing of amicus curiae briefs by the Insurance Environmental Litigation Association[7] in support of State Farm and by the Mid-America Legal Foundation[8] on behalf of Bell.

II.
The version of the Business PolicySpecial Form 3 issued to Ka-Jon by State Farm was printed in July, 1982. It is a standard commercial general liability (CGL) policy[9] providing coverage per occurrence.[10] Its Business Liability Exclusions section contains the following pollution exclusion:
Under Coverage L, this policy does not apply:
* * * * * *
5. to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon the land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental; ...
(bold in original; bold denotes terms defined by the policy)
Ka-Jon's April 1, 1986 renewal of the policy, insuring the period which encompassed Bell's damages claim, added a Pollution Exclusion Endorsement (printed in March, 1986). This endorsement, known as an "absolute" pollution exclusion, replaced the previously quoted pollution exclusion. It provides as follows:

POLLUTION EXCLUSION ENDORSEMENT
It is agreed that Exclusion 5. (Exclusion 6. in the BUILDER'S RISK POLICY) under Section IIBUSINESS LIABILITY EXCLUSIONS is deleted and replaced with the following:

*360 Under Coverage L, this policy does not apply:
5. to any:
a. bodily injury or property damage arising out of the actual, alleged or threatened discharge, dispersal, spill, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials (including those to be recycled, reconditioned or reclaimed), or other irritants, contaminants or pollutants:
(1) at or from the premises owned, rented or occupied by the named insured;
(2) at or from any site or location used by or for the named insured or others for the handling, storage, disposal, processing or treatment of waste;
(3) which are at any time transported, handled, stored, treated, disposed of, or processed as waste by or for the named insured or any person or organization for whom the named insured may legally be responsible; or
(4) at or from any site or location on which the named insured, employee or any contractor or subcontractor working directly or indirectly on behalf of the named insured is performing operations:
(a) if the pollutants are brought on or to the site or location in connection with such operations; or
(b) if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants;
b. loss, cost or expense arising out of any governmental direction or request that the named insured test for, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants.
All other provisions of this policy apply. (bold in the original; bold denotes terms defined by the policy)

III.
An insurance policy is a contract and, as with all other contracts, it constitutes the law between the parties. Pareti v. Sentry Indem. Co., 536 So.2d 417 (La.1988); Carney v. American Fire & Indem. Co., 371 So.2d 815 (La.1979). As a contract, the insurance policy is construed by using the general rules of interpretation of contracts as set forth in Civil Code articles 2045 through 2057. Crabtree v. State Farm Ins. Co., 93-0509 (La. 2/28/94); 632 So.2d 736 (La.1994); Louisiana Insurance Guaranty Association v. Interstate Fire & Casualty Co., 630 So.2d 759 (La.1994); Smith v. Matthews, 611 So.2d 1377 (La.1993). Interpretation of a contract is the determination of the common intent of the parties. LSA-C.C. art. 2045. When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent. LSA-C.C. art. 2046. The determination of whether a contract is clear or ambiguous, however, remains a question of law.
The parties' common intent is determined in accordance with the general, ordinary, plain and popular meaning of the words used in the policy, unless the words are words of art or have acquired a technical meaning. LSA-C.C. art. 2047; Louisiana Insurance Guaranty Association v. Interstate Fire & Casualty Co., supra; Breland v. Schilling, 550 So.2d 609 (La.1989). Words susceptible of different meanings must be interpreted as having the meaning which best conforms to the object of the contract. LSA-C.C. art. 2048. Although worded in general terms, the contract must be interpreted to cover only those things it appears the parties intended to include. LSA-C.C. art. 2051.
Each provision in an insurance policy must be interpreted in light of the other provisions so that each is given the meaning suggested by the policy as a whole. See LSA-C.C. art. 2050. Provisions susceptible of different meanings must be interpreted with a meaning that renders it effective and not with a meaning that renders it ineffective. LSA-C.C. art. 2049. Doubtful provisions must be interpreted in light of the nature of the contract, equity,[11] usage, the conduct of the parties before and after the formation of the contract, and of other insurance contracts between the parties. See LSA-C.C. art. *361 2053. Further, insurance policies should not be interpreted in an unreasonable or strained manner so as to enlarge or restrict provisions beyond what was reasonably contemplated by the policy's terms, or so as to achieve an absurd conclusion. Crabtree v. State Farm Ins. Co., supra; Louisiana Insurance Guaranty Association v. Interstate Fire & Casualty Co., supra; see LSA-C.C. art. 2053, Revision Comment (a). Thus, ambiguity in an insurance policy must be resolved by construing the document as a whole. One provision cannot be construed separately at the expense of disregarding other policy provisions. Louisiana Insurance Guaranty Association v. Interstate Fire & Casualty Co., supra; Pareti v. Sentry Indemnity Co., supra; Benton Casing Service, Inc. v. Avemco Ins. Co., 379 So.2d 225 (La.1979), on reh'g; Benton v. Long Mfg. N.C., Inc., 550 So.2d 859, 860 (La.App. 2d Cir.1989) ["The prime consideration in interpreting a provision of an insurance policy is to ascertain the true intentions of the parties from the language of the policy as a whole."].
If, after applying these general rules of contract interpretation, an ambiguity remains in the policy of insurance, the ambiguous provision is to be construed against the insurer as it is the party which furnished its text. LSA-C.C. art. 2056; Crabtree v. State Farm Ins. Co., supra; Louisiana Insurance Guaranty Association v. Interstate Fire & Casualty Co., supra; Smith v. Matthews, supra; Borden, Inc. v. Howard Trucking Co., Inc., 454 So.2d 1081 (La.1983); Pareti v. Sentry Indemnity Co., supra; Rodriguez v. Northwestern Nat. Ins. Co., 358 So.2d 1237 (La.1978); see also 15 La. Civil Law Treatise (M & J) § 4 (2d reprint, 1986). The ambiguity is also to be resolved by ascertaining how a reasonable insurance policy purchaser would have construed the clause at the time the insurance contract was entered. Breland v. Schilling, supra; Louisiana Insurance Guaranty Association v. Interstate Fire & Casualty Co., supra [recognized the "reasonable expectations doctrine," citing 2 Richards on the Law of Insurance § 11.2[g] (6th Ed.1990)].
Absent a conflict with statutory provisions or public policy, insurers are entitled to limit their liability and/or to impose and enforce reasonable conditions upon the policy obligations they contractually assume. Louisiana Insurance Guaranty Association v. Interstate Fire & Casualty Co., supra; Oceanonics, Inc. v. Petroleum Distributing Co., 292 So.2d 190 (La.1974); Benton Casing Service, Inc. v. Avemco Ins. Co., on orig h'rg, supra; Benton v. Long Mfg. N.C., Inc., supra. However, when the preceding general rules of contract interpretation are applied to an exclusion, the result is the exclusionary clause is interpreted liberally in the insured's favor, in favor of coverage. Borden, Inc. v. Howard Trucking Co., Inc., supra; Breland v. Schilling, supra; Sanders v. Home Indem. Ins. Co., 594 So.2d 1345, 1352-1353 (La.App. 3d Cir.1992), on reh'g, writ den., 598 So.2d 377 (La.1992). Any exclusion from coverage in an insurance policy must be clear and unmistakable. Roger v. Estate of Moulton, 513 So.2d 1126, 1130 (La.1987). Implication will not suffice. Borden, Inc. v. Howard Trucking Co., Inc., supra.
The test for determining the intentions of the parties is governed, not by what the insurer intended the words to mean, but by what a reasonable person in the position of the insured would have understood them to mean. See Anderson v. Indiana Lumbermen Mutual Ins. Co., 127 So.2d 304, 308 (La.1961). Since the primary object of all insurance policies is to insure, exclusionary clauses are strictly construed against the insurer. Borden, Inc. v. Howard Trucking Co., Inc., supra; Breland v. Schilling, supra [policies of insurance should be construed to give effect, not deny coverage]. The insurer is required to clearly express exclusions to its insuring obligations. Any doubt or ambiguity is to be resolved against the insurer, against forfeiture, and in favor of what reason and probability dictate was intended by the parties with respect to coverage. Benton Casing Service Inc. v. Avemco Ins. Co., on reh'g, supra; Breland v. Schilling, supra. Hence, the court has long-adhered to principle that,
"The exclusion clause must necessarily be examined and interpreted in the light of its own design and intent, as well as in view of the objects and purpose of the policy. Once coverage has been extended, *362 as it is quite clearly the purpose of the policy to do and has been done here, it should be withdrawn only when the exclusion is established with certainty. And because comprehensive exclusion is violative of the purpose and intent of policy coverage, exclusions must necessarily be specific and not general ..." Anderson v. Indiana Lumbermens Mutual Ins. Co., 127 So.2d at 306, quoting Pullen v. Employers' Liability Assur. Corp., 230 La. 867, 89 So.2d 373 (1956).

IV.
The history of the "absolute" pollution exclusion contributes insight as to its purpose, design and/or intent, as well as to the equities involved in its confection. It reveals that insureds have exploited insurance coverage and insurers have abused pollution exclusions: at one end of the spectrum are the intentional industrial polluters of hazardous waste who compel insurers to bear their environmental cleanup costs, while at the other end are the insurers who deny coverage of nonenvironmental accidents even though the accidents have no greater connexity to the pollution exclusion than does a morning drive to work. An overview of the exclusion's evolution, therefore, supplements the determination of what reason and probability dictate the parties intended with respect to policy coverage.
Since the mid 1960's standard CGL policies have provided coverage per "occurrence," i.e., coverage for fortuitous losses or damages not expected or intended by the insured, which result during the policy period. See La. Environmental Handbook, §§ 23:5, 23:6 (6/92). In the early 1970's, insurers began including in CGL policies pollution exclusion clauses. La. Environmental Handbook, § 23:9. Their justification for inclusion of the exclusionary clauses was their need to clarify the insurance industry's intent not to cover intended or expected discharges of pollutants or contaminants, including long-term discharges, discharges which are a regular or continuous part of the insured's business, and intentional discharges which cause unexpected and unintended damages. See La. Environmental Handbook, § 23:9; see also Morton International Inc. v. General Accident Ins. Co. of America, 134 N.J. 1, 629 A.2d 831 (N.J.1993) [describes the regulatory history of 1970's pollution exclusion and the misleading representations the insurance industry made to the regulators of numerous states regarding the limited scope of the prospective exclusionary clause, that it only clarified the meaning of "occurrence;" subsequently, the insurers interpreted the exclusion with far broader ramifications].
An example of the 1970's type exclusion is Ka-Jon's original exclusion, which excluded from coverage damages "arising out of the discharge, dispersal, release or escape of pollution "into or upon the land, the atmosphere or any water course or body of water" if the discharge, dispersal, release or escape was not "sudden and accidental." See p. 358, supra. This type of exclusion, however, was construed by many courts as applying only to "active polluters,"[12] as being ambiguous,[13] or as being only a restatement of "occurrence" with no temporal qualities[14] attaching to the phrase "sudden and accidental." La. Environmental Handbook, § 23:9.
In the early 1980's, the federal government and the states enacted legislation which subjected both individuals and corporate entities to significant liability for their pollution causing activities and waste disposal practices. See La. Environmental Handbook, § 23:1 (6/92). For example, see the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), 42 U.S.C.S. *363 §§ 9601 et seq.; the Louisiana Liability for Hazardous Substance Remedial Action Law (Mini-Superfund), LSA-R.S. 30:2271 et seq; and the Louisiana Environmental Quality Act (LEQA), LSA-R.S. 30:2001 et seq. The legislation contains mechanisms to ensure cleanup costs, to correct environmentally harmful conditions caused by pollution activities, are borne by those who caused the pollution. See LSA-R.S. 30:2271(B); La. Environmental Handbook, § 2:5. However, many of those held liable for environmental pollution damages passed or attempted to pass on their liabilities to their CGL policy insurers. See La. Environmental Handbook, § 23:1; Morton International Inc. v. General Accident Ins. Co. of America, supra [insured sought to compel insurer to bear the remediation costs of its (predecessor's) prolonged discharge of mercury and other pollutants into an estuary of a river]; Buckeye Union Ins. Co. v. Liberty Solvents & Chem. Co. Inc., 17 Ohio App.3d 127, 477 N.E.2d 1227 (1984) [insurer's duty to defend encompassed property damage from a continuing course of irresponsible waste disposal practices by operator of hazardous-waste facility hired by insured to dispose of hazardous waste].
The insurance industry responded to the extensive liability coverage litigation over the interpretation of the 1970's type exclusion, to the courts' diverse interpretations of the exclusion, and to the environmental cleanup damages it was found to insure, by shifting in 1985 to the "absolute" pollution exclusions. See La. Environmental Handbook, § 23:9. The "absolute" exclusions eliminated the "sudden and accidental" exception to exclusion, and clearly stated that environmental cleanup expenses were not covered damages. See Id.; The Fire Casualty & Surety (FC & S) Bulletin, Aa-9 (Sept. 1993, 4th printing). Ka-Jon's 1986 policy renewal contained this type of "absolute" pollution exclusion.[15]
Because of the breadth of the "absolute" pollution exclusion, the insurance industry admits that it is advisable, even for insureds whose chances of becoming liable for a "pollution" incident are remote, to procure pollution protection by endorsements. FC & S Bulletin, supra at Aa-9. Indeed, the insurance industry has given a seemingly boundless interpretation to the "absolute" pollution exclusion. Jurisprudence evinces insurers construe the exclusion to encompass and, therefore, have attempted to exclude insurance coverage of incidents, where sparks from burning trash ignite a brush fire which creates a black cloud of smoke over a roadway thereby causing a traffic accident; where renters of a home are overcome by carbon monoxide fumes leaking from a gas heater located in the bathroom; and where chicken stored in a freezer at a chicken processing facility becomes contaminated from vapors released when a nearby room was resurfaced. Avery v. Commercial Union Ins. Co., supra [brush fire]; Thompson v. Temple, 580 So.2d 1133 (La.App. 4th Cir. 1991) [homeowner's policy; bathroom heater]; West American Ins. Co. v. Tufco Flooring East, Inc., 104 N.C.App. 312, 409 S.E.2d 692 (1991), writ den., 332 N.C. 479, 420 S.E.2d 826 (1992) [floor resurfacing]. See also Molton, Allen, Williams, Inc. v. St. Paul Fire & Marine Ins. Co., 347 So.2d 95 (Ala. 1977) [insurer claimed 1970's style exclusion precluded coverage where, after a rainstorm, earth materials/dirt washed from a construction site into a lake and neighboring property]; A-1 Sandblasting and Steamcleaning Co., Inc. v. Baiden, 293 Or. 17, 643 P.2d 1260 (1982) [insurer claimed 1970's style exclusion precluded coverage where, despite precautions taken, paint got on automobiles in the course of spray painting a bridge]; Grinnell Mut. Reinsurance Co. v. Wasmuth, 432 N.W.2d 495 (Minn.App.1989), writ den. (1989) [insurer claimed 1970's style exclusion precluded coverage where formaldehyde fumes from improperly installed residential insulation caused bodily injury to residents].

V.
Turning to the exclusion at issue, a determination of Ka-Jon and State Farm's common *364 intent requires an analysis of the words contained in the pollution exclusion endorsement.[16] They are clear and explicit. Nonetheless, a literal application of certain portions of the exclusion, the method advanced by State Farm, precludes coverage of many routine business accidents.[17] The all inclusiveness of the words used in the exclusion are adverse to both the policy's nature and its primary purpose which is to insure Ka-Jon against fortuitous accidents and incidental business risks of running its convenience store. The literal application of the exclusion's words leads to absurd consequences is at odds with the policy's nature. CGL policies protect against the premises, operations, products, completed operations and independent contractor hazards of the insured. No reasonable insured would intend for a pollution exclusion to basically eviscerate this coverage. Since the language of the exclusion fails to clearly express the common intent of the parties, it is ambiguous as a matter of law. LSA-C.C. art. 2045. As a consequence, the exclusion must be interpreted in the manner in which a reasonable insurance purchaser would have construed it at the time of the policy's renewal and it must be interpreted liberally, in favor of coverage.
Labels and headings given to the sections of an insurance policy are pertinent to the inquiry of coverage. Benton Casing Service, Inc. v. Avemco Ins. Co., on reh'g, supra. The heading of the exclusion, Pollution Exclusion Endorsement, signifies its nature and purpose.[18]Webster's New Collegiate Dictionary (1981), defines "pollution" as "the action of polluting: the condition of being polluted." In turn, it defines "pollute" as: "to make physically impure or unclean: BEFOUL, DIRTY, esp: to contaminate (an environment esp. with man-made waste syn see contaminate."[19] The exclusion's heading, indicates it pertains to environmental pollution. In the context of the policy's purpose, the exclusion's heading and all of its provisions (instead of excerpted portions of it), the exclusion signifies an intent to exclude coverage of 1) all damages or losses resulting from intentional acts of pollution or pollution causing activities,[20] including remedial damages for environmental cleanup operations, and 2) environmental damages resulting from fortuitous pollution occurrences, including remedial damages for environmental cleanup operations.
The "absolute" pollution exclusion in Ka-Jon's policy is not triggered by nonenvironmental, *365 routine accidents merely because they involve spills, leaks, discharges (etc.) of items that can be considered contaminants or pollutants. The exclusion is not applicable to fortuitous occurrences which involve only incidental pollution, i.e., accidents where pollution is inconsequential to the damages sustained. Consequently, where carbon monoxide gas leaks from a heater causing bodily injuries, or where bridge painting activities result in paint getting on passing automobiles, the nonenvironmental pollution incidents should not be classified by the insurer as pollution events encompassed by the exclusion, but merely as routine accidents with covered loss damages.
In contrast, the pollution exclusion is applicable to all damages resulting from intentional pollution or environmentally hostile conduct. The pollution exclusion precludes coverage of all types of damages resulting from deliberate, knowing and intentional acts of pollution, even where the damages or pollution damages are unexpected or unintended. This absolute exclusion of coverage is consistent with public policy which condemns intentional pollution and proscribes insuring intentionally wrongful conduct.
In the middle of these two extremes are the fortuitous events or occurrences (not involving prohibited pollution causing activities like those listed in the exclusion, § 5(a)(2)-(4)), which result in partial to comprehensive environmental damage. In such instances, a reasonable interpretation of the terms of the policy and exclusion, which mindfully favors coverage, indicates the pollution exclusion is intended to only exclude from coverage environmental pollution damages.
Consequently, when an occurrence arises which involves the "actual, alleged or threatened discharge, dispersal, spill, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials (including those to be recycled, reconditioned or reclaimed), or other irritants, contaminants or pollutants," a fact-sensitive analysis of the cause of the occurrence and the nature of damages sustained must be undertaken to determine whether the pollution exclusion is triggered and, if so, whether any or all of the damages are excluded from coverage by the "absolute" pollution exclusion endorsement.
Thus, the overly broad and abstract construction of the exclusion promoted by State Farm is rejected. This narrower construction furnishes a reasonable view of the exclusion in light of the insured's understanding of the exclusion, and of the design and intent of the insurance policy as a whole.

VI.
The motion for summary judgment, together with any pleadings, affidavits and exhibits, must now be examined to ascertain whether the appellate court erred in determining no genuine issues of material fact exist, the endorsement excludes all liability coverage for the claimed damages and requested remedial relief, and State Farm is entitled to judgment as a matter of law.
Appellate courts review summary judgments de novo, under the same criteria which govern the district court's consideration of the appropriateness of summary judgment. Potter v. First Federal Savings and Loan Assoc. of Scotlandville, 615 So.2d 318 (La. 1993); Schroeder v. Board of Sup'r of Louisiana State University, 591 So.2d 342 (La. 1991). Code of Civil Procedure art. 966(A) directs that plaintiff or a defendant in the principal or any incidental action, with or without supporting affidavits, may move for summary judgment in his favor for all or part of the relief for which he has prayed. Judgment on the motion is properly granted only if the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show there is no genuine issue of material fact and the mover is entitled to summary judgment as a matter of law. LSA-C.C.P. art. 966(B); Potter v. First Federal Savings and Loan Assoc. of Scotlandville, supra; Penalber v. Blount, 550 So.2d 577 (La.1989). The mover has the burden of establishing that no material fact exists. Potter v. First Federal Savings and Loan Assoc. of Scotlandville, supra.
When the pollution exclusion, as interpreted, is applied to Bell's damages claim, it is evident that policy coverage is not precluded. The gas leak from Ka-Jon's underground *366 storage tanks constituted an environmental pollution accident. However, the damages were not caused by intentional pollution. Ka-Jon did not intend to pollute. Moreover, it had no reason to believe that one of its underground tanks leaked. Its interrogatory answers reveal its daily testing of the tanks showed no evidence of a leak. Under the terms of the exclusion, when a fortuitous pollution event or occurrence happens causing environmental damage, only the environmental pollution damages are excluded from coverage. Consequently, the damage sustained to Bell's underground cables, since it is nonenvironmental, is not an excluded loss under the pollution exclusion. See notes 10-11. Therefore, as State Farm is not entitled to deny coverage of Bell's damages claim, the summary judgment relative to that claim was improperly granted as a matter of law.
Review of the propriety of granting summary judgment as to Bell's claim for cleanup measures to remove the gasoline contamination from the soil and groundwater, involves application of the principles of equity in addition to the terms of the pollution exclusion. When the pollution exclusion, as interpreted, is applied to Bell's remediation damages claim, it is evident that the exclusion precludes coverage of those damages. The exclusion expressly precludes coverage of cleanup costs; it also excludes the environmental pollution damages from coverage. However, when the previously stated criteria for reviewing the appropriateness of a summary judgment are applied, genuine issues of material fact are found to exist which make the judgment improper. Public policy and equitable considerations exist which require resolution before the endorsement can be enforced. See generally, 15 La. Civil Law Treatise § 3. They are of a sufficient magnitude to preclude judicial enforcement of the pollution exclusion against Bell's claim for injunctive/remedial relief.
The evidence on record shows Ka-Jon's annual renewal, together with the pollution exclusion endorsement, became effective on April 1, 1986. Ka-Jon's previous policy contained the 1970's style pollution exclusion which excepted "sudden and accidental" pollution incidents from preclusion and covered remediation costs. The shift from State Farm's use of the 1970's style pollution exclusion to the "absolute" pollution exclusion constituted a distinct decrease in insurance coverage. Nonetheless, State Farm's motion and supporting evidence fails to show what reduction in premium Ka-Jon received in exchange for its reduced insurance protection. Nor does it show Ka-Jon was advised in advance of April 1, 1986 that its renewal would contain the pollution exclusion endorsement and/or the extent of the exclusion's impact on the renewal's insurance coverage. Finally, State Farm did not show Ka-Jon was informed of the availability of pollution coverage endorsements or the advisability of obtaining such endorsements in light of the nature of its business operations and its reduced insurance coverage from the pollution exclusion endorsement.
An unchanged premium is consistent with unchanged coverage. If Ka-Jon received no reduction in its premium, Ka-Jon could reasonably have relied that it was receiving substantially the same protection against fortuitous damages, losses and risks which it had received under its previous business insurance policy. Conversely, if State Farm had reduced Ka-Jon's premium, and the reduction was not attributable to causes other than exclusion, then the implication is that Ka-Jon received a lowered premium in return for its decreased coverage. Public policy and equity demands that when State Farm significantly decreased Ka-Jon's insurance coverage, it had an obligation to give it a comparable premium reduction. See, 15 La. Civil Law Treatise § 3. As the record is void of evidence establishing State Farm comparably reduced Ka-Jon's premium in exchange for reducing its coverage, genuine issues of material fact exist as to whether State Farm was unjustly enriched so as to estop its enforcement of the endorsement. Therefore, a summary judgment enforcing the endorsement was improperly granted.
Further, genuine issues of material fact exist, sufficient to preclude summary judgment, as to whether State Farm breached its obligation to inform Ka-Jon of the availability and advisability of obtaining pollution coverage endorsements. State Farm's arguments *367 to this court indicate it subjectively intended the "absolute" pollution exclusion to eliminate coverage of all pollution related damages. As Ka-Jon's insurer, it was aware that Ka-Jon sold gasoline and that the gasoline was stored in underground storage tanks. Thus, in light of this intent to exclude all pollution related damages from policy coverage, and its intent to have pollution damages like those caused by leaking underground storage tanks to be borne solely by those whose businesses involve such pollution risks through coverage endorsements, State Farm had an obligation to forewarn Ka-Jon about the availability of pollution coverage endorsements and the advisability of it obtaining such coverage for when the pollution exclusion endorsement took effect. This obligation arose from the realities of the parties' relationship which involves no open-term bargaining of comparably informed equals, but "adhesion contract" qualities and a significant disparity in insurance expertise. See, 15 La. Civil Law Treatise § 3. If the availability of and need for the pollution coverage endorsements were kept an industry secret, then State Farm unconscionably breached its duty to inform and affronted the demands of equity by exposing its insured to liability for perils it believed were covered.[21] Consequently, as the record is void of evidence showing that State Farm complied with this obligation to inform, genuine issues of material fact exist as to State Farm's right to enforce any part of the pollution exclusion endorsement. Therefore, a summary judgment granting its enforcement was improperly granted.

DECREE
For the reasons assigned, the summary judgment rendered in favor of State Farm is vacated and the case is remanded to the trial court for further proceedings. Costs are assessed against defendant/respondent State Farm.
VACATED AND REMANDED.
WATSON, J., concurs in the result.
HALL, J., dissents and assigns reasons.
LEMMON, J., dissents for the reasons assigned by HALL, J.
HALL, Justice, dissenting.
I agree with much of the majority opinion analysis, but disagree with the application of that analysis to the facts of this case. I would conclude that the pollution exclusion endorsement excludes coverage of the environmental pollution damages occasioned in this case.
The majority starts its analysis by finding that a literal application of the exclusion would lead to absurd consequences by virtually eviscerating coverage under the liability policy. Therefore, the exclusion must be interpreted in a reasonable manner, and liberally in favor of coverage. I agree to this point.
The majority opinion then reasons that the exclusion pertains to environmental pollution and does not apply to nonenvironmental, routine accidents merely because they involve spills, leaks, discharges, or the like. I agree completely.
Then the majority opinion interprets the policy to exclude coverage for all losses resulting from intentional acts of pollution but only environmental damage from fortuitous pollution occurrences. Applying the exclusion to plaintiff's claim for damage to its cables, the opinion notes that the gasoline leakage was an environmental pollution accident and the damage was not caused by intentional pollution. Since the damage was caused by a fortuitous event, only environmental damage is excluded and damage to cables being nonenvironmental, is not excluded from coverage.
It is only in this final stage of the analysis that I part company with the majority opinion. The exclusion makes no distinction between *368 intentional and fortuitous pollution. The damage to Bell's cables clearly resulted from environmental pollution. Gasoline leaked from the underground storage tanks, polluted and contaminated the ground, and the contamination eventually caused the damage to the cables.
I would hold that the property damage caused by environmental pollution is excluded from coverage under the pollution exclusion endorsement of the policy, and affirm the judgment of the court of appeal. Accordingly, I respectfully dissent.
NOTES
[1] Judge Charles A. Marvin, Court of Appeal, Second Circuit, sitting in place of Justice James L. Dennis. Pursuant to Rule IV, Part 2§ 3, Kimball, J. is not on the panel which heard and decided this case.
[2] After this suit was filed, Ka-Jon sought protection under Chapter 7 of the bankruptcy code in In Re: Ka-Jon Food Stores of Louisiana, Inc. d/b/a Ka-Jon Food Stores, No. 90-00818, United States Bankruptcy Court, Middle District of Louisiana.
[3] In West, plaintiff fireman filed suit for the lung injuries he sustained while investigating a report on a toxic incident, against the defendant warehouse services company which was storing drums containing azinphosmenthyl. The warehouse's insurer filed a motion for summary judgment claiming it had no duty to defend based upon the terms of its "absolute" pollution exclusion. The trial court granted the motion but the appellate court vacated the judgment finding genuine issues of material fact existed as to whether the warehouse was an "active polluter," i.e., one who indifferently pollutes the environment and not one who incidently possesses a pollutant in the course of business which escapes. 591 So.2d at 1360. The appellate court concluded the "absolute" pollution exclusion applies only to active polluters.
[4] See note 3, supra.
[5] See note 3, supra.
[6] See note 3, supra.
[7] The Insurance Environmental Litigation Association is a trade association of major property and casualty insurers including, Aetna Casualty & Surety Company, Allstate Insurance Company, American International Group, Chubb Group of Insurance Companies, CIGNA Property and Casualty Companies, Continental Insurance Company, Crum & Forster Corporation, Fireman's Fund Insurance Companies, Hanover Insurance Company, Hartford Insurance Group, Home Insurance Company, Liberty Mutual Insurance Company, Maryland Insurance Company, Zurich-American Insurance Group, Prudential Reinsurance Company, Royal Indemnity Company, St. Paul Companies, Selective Insurance Group of America, The Travelers Insurance Company and Unites States Fidelity & Guaranty Company.
[8] Mid-America Legal Foundation is a non-profit corporation organized in 1975 which engages in non-partisan legal research, study and analysis for the general public, with a special interest in the Midwest region of the country. It maintains that it endeavors to impact on evolving concepts of law which affect free enterprise and democracy.
[9] Under the standard policy form, the CGL policy protects against the premises, operations, products, completed operations and independent contractor hazards. By endorsements, the policy may also exclude specific hazards or provide additional coverage. 15 La. Civil Law Treatise (M & J) § 181 (2d reprint, 1986).
[10] The policy's Coverage LBusiness Liability section provides in pertinent part as follows:

The Company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury, property damage or personal injury caused by an occurrence to which this insurance applies. The total liability of the Company for all damages, included completed operations hazard, product hazard, and damages for care and loss of services, as a result of any one occurrence shall not exceed the limit of liability stated in the Declarations as applicable to each occurrence.
(bold in original; bold denotes terms defined by the policy)
The policy defines "occurrence" as:
11. occurrence means an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured and with respect to personal injury, ...
(bold in the original; bold denotes terms defined by the policy)
[11] "Equity," as intended herein, is "based on the principles that no one is allowed to take unfair advantage of another and that no one is allowed to enrich himself unjustly at the expense of another." LSA-C.C. art. 2055.
[12] For example, United Pacific Ins. Co. v. Van's Westlake Union, Inc., 34 Wash.App. 708, 664 P.2d 1262 (1983), writ den., 100 Wash.2d 1018 (1983).
[13] For example, Sellers v. Seligman, 463 So.2d 697 (La.App. 4th Cir. 1985), writ den., 464 So.2d 1379 (La.1985); Helca Mining Co. v. New Hampshire Ins. Co., 811 P.2d 1083 (Col.1991); Farm Family Mut. Ins. Co. v. Bagley, 64 A.D.2d 1014, 409 N.Y.S.2d 294 (1978); Kipin Industries, Inc. v. American Universal Ins. Co., 41 Ohio App.3d 228, 535 N.E.2d 334 (1987).
[14] For example, Helca Mining Co. v. New Hampshire Ins. Co., supra; Allstate Ins. Co. v. Klock Oil Co., 73 A.D.2d 486, 426 N.Y.S.2d 603 (1980); Buckeye Union Ins. Co. v. Liberty Solvents & Chem. Co., Inc., 17 Ohio App.3d 127, 477 N.E.2d 1227 (1984).
[15] For other business policy examples see, West v. Board of Com'rs, supra; Avery v. Commercial Union Ins. Co., 621 So.2d 184 (La.App. 3d Cir. 1993); Crabtree v. Hayes-Dockside, Inc., 612 So.2d 249 (La.App. 4th Cir. 1992), writ den., 614 So.2d 1257 (La.1993). "Absolute" pollution exclusions are also found in many other types of insurance policies, including builder's policies, farmer's policies, homeowner's policies and automobile policies. For example Thompson v. Temple, 580 So.2d 1133 (La.App. 4th Cir.1991) [homeowner's policy].
[16] There is no evidence on record establishing that Ka-Jon was apprised by State Farm prior to the renewal of its insurance policy that the renewal would contain a pollution exclusion endorsement, informed it of the context/language of the endorsement, or informed it of the availability of pollution coverage endorsements.
[17] The literal application of § 5(a)(1) of the pollution exclusion indicates that, if one of Ka-Jon's customers slips on oil leaking from a quart-sized container, their ensuing claim for bodily injury would be excluded from coverage. Likewise, if a container of Drano fell from one of the convenience store's shelves onto a customer, the personal injuries resulting from the toxic chemical spill would be excluded from insurance coverage. Similarly, if, in an attempt to eradicate insect infestation, the convenience store accidentally sprayed both the insects and its customers with insecticide, or if any of the convenience store's natural gas appliances leaked gas and caused bodily injury, the "actual ... discharge, dispersal, spill, release or escape of ... fumes, acids, alkalis, toxic chemicals, ... or gases, ... or other irritants, contaminants or pollutants: (1) at or from the premises owned, rented or occupied by the named insured" would preclude insurance coverage of the incidents.
[18] The result of this opinion would be the same even if the exclusion had a heading which did not contain the word "pollution." The history of the exclusion emphatically demarks it as a pollution exclusion.
[19] Similarly, Black's Law Dictionary (5th Ed. 1983), which does not define "pollution," defines "pollute" as: "To corrupt or defile. The contamination of soil, air and water by noxious substances or noises." See also Mississippi River Interstate Pollution Phase-Out Compact, LSA-R.S. 30:2091 et seq (defines "pollution" as "man-made alteration of water ..."); Louisiana Environmental Quality, LSA-R.S. 30:2003 et seq (defines "pollution source" and "pollutant"); Oil Spill Prevention and Response Act, LSA-R.S. 30:2451 et seq (defines "pollution" as "the presence of harmful quantities of oil in waters of the state or in or on adjacent shorelines, estuaries, tidal flats, beaches or marshes"); Liability for Hazardous Substance Remedial Action, LSA-R.S. 30:2271 et seq (defines "pollution source").
[20] Like those described in §§ 5(a)(2)-(4).
[21] Cf. Rodriguez v. Northwestern Nat. Ins. Co., 358 So.2d at 1237 ["Due to the increasing complexity of insurance policies and to the greater danger of overreaching by insurers'their gaining an unconscionable advantage by the use of complex policy provisions concerning facts that the untutored purchaser would be surprised to find relevant to his insurance coverage'many states, including Louisiana, enacted `anti-technical' statutes designed to preclude denial of coverage through the assertion of defenses not materially significant to the risk."]