731 So.2d 482 (1999)
George C. YARBROUGH, et al., Plaintiffs-Appellants,
v.
The FEDERAL LAND BANK OF JACKSON, et al., Defendants-Appellees.
No. 31,815-CA.
Court of Appeal of Louisiana, Second Circuit.
March 31, 1999.
*484 Theus, Grisham, Davis & Leigh by Phillip D. Myers, Monroe, Counsel for Appellant, Liberty Mutual Ins. Co.
Mayer, Smith & Roberts by Steven E. Soileau, Shreveport, Counsel for Appellee, U.S. Fire Ins. Co.
F. Scott Kaiser, Rebecca Crawford, Baton Rouge, Counsel for J. Burns Wright.
Samuel T. Singer, Winnsboro, Counsel for Clovis C. Bringol.
Cotton, Bolton, Hoychick & Doughty by John Hoychick, Jr., Rayville, Counsel for Dallas Thomason.
W. Brian Babin, Baton Rouge, Counsel for Estate of Warner Bruner.
Before NORRIS, C.J., and KOSTELKA and DREW, JJ.
NORRIS, Chief Judge.
In this breach-of-contract and tort action against the Federal Land Bank of Jackson and several of its officers and directors, the bank's insurer, Liberty Mutual Insurance Company ("Liberty"), appeals a summary judgment finding that it has a duty to defend the defendant officers and directors against plaintiffs' suit. For the reasons assigned, we affirm.

FACTS AND PROCEDURAL HISTORY
In the 1980's, George Yarbrough secured $13 million in debts to Federal Land Banks in Jackson, Mississippi and Alexandria *485 and Rayville, Louisiana by pledging his Federal Land Bank stock and by mortgaging approximately 8,200 acres of farmland he owned in Franklin and Catahoula Parishes as well as a cotton gin he operated and its associated property.[1] In 1985, Yarbrough defaulted on the loans. Rather than declare bankruptcy, he dationed his land and stock to the Federal Land Bank of Jackson ("the Bank") in satisfaction of the debt on March 20, 1985. On the same date and in conjunction with the dation, the Bank leased Yarbrough 2,662 acres of his former land to which he claimed "a very personal [family] attachment," including the cotton gin. Terminating on January 10, 1986, this lease gave Yarbrough the "first right of refusal" to buy all or part of the leased land "at the purchase price offered [to the Bank] by a third party within 30 days after receiving written notice of said offer."
In July 1985, the Bank received an offer on the cotton gin and notified Yarbrough. At that time, Yarbrough exercised his right of first refusal on that six acre parcel for $200,000. As to the remaining property, Yarbrough received no notice of any additional offers before the lease terminated. Nonetheless, Yarbrough suspected that the Bank had received but had not notified him of other offers on the remaining property. As a result, Yarbrough's attorney sent a letter to the Bank on March 4, 1985, asking whether the Bank had received any offers on the property or taken action to prevent consideration of offers prior to the lease's expiration. The Bank replied that it "was obligated to give Mr. Yarbrough the opportunity to purchase the land at such time as an offer from a third party acceptable to the bank was received" but that it had received no such offers.
On August 4, 1986, Yarbrough filed the present action against the bank. In his initial petition, Yarbrough alleged that the Bank failed to honor the right of first refusal; specifically, he alleged that his son-in-law, George McAlister, had made a good faith offer on the property in May 1985 but the bank failed to communicate it to him. Additionally, he alleged that the Bank had listed the property for sale along with other bank-owned property but with the provision that it would not be sold until January 1, 1986, shortly before the lease and right of first refusal expired, and had failed to inform him, when he executed the dation and lease, of its internal policy of not selling such property to either the defaulting debtor or his immediate family members. Thus, contending that the bank had no intention of honoring his right of first refusal, Yarbrough claimed $10 million in damages for alleged lost profits he would have realized upon buying the property back.
Yarbrough died on June 7, 1989. On May 29, 1990, his estate and widow were substituted as plaintiffs and filed an amended and supplemental petition increasing the demand for damages to $30 million.[2] The petition joined as defendants several individual officers and directors of the bank, namely Warner Bruner,[3] Burns Wright, Dick Bringol and Dallas Thomason (hereinafter referred to as the "Named Officers."). Additionally, the pleading listed as an unknown defendant "XYZ Insurance Company" which was alleged to be "an insurance company that at all times material and pertinent [to the litigation] had in full force and effect an insurance *486 policy providing coverage to officers, employees and directors for liability resulting from the acts described [in the petition]."
The amended petition also expanded the allegations of wrongdoing, including a contention that Bruner collaborated with the other Named Officers to reject two offers on the leased land: one from Yarbrough's son-in-law for $929 per acre in May 1985 and another from a neighboring farmer for $1000 per acre in June and July 1985. They then sold the land to other buyers for $640-740 per acre after the right of first refusal expired. The petition concluded that the defendants' actions constituted torts, breach of contract, and intentional interference with contract rights, all resulting in mental anguish, pain, suffering, and loss of profits.
In March 1992, plaintiffs through discovery learned that Old Republic Insurance Company ("Old Republic") provided the Bank with an officers and directors indemnity policy and accordingly amended the second petition to substitute this insurer for the previously unidentified "XYZ Insurance Company." After further discovery, plaintiffs filed a Third Amended and Supplemental Petition naming Liberty, Home Insurance Company of Illinois, and National Union Fire Insurance Company of Pittsburgh as additional parties contending that each insurer had issued insurance policies that provided coverage to one or more of the defendants for "liability resulting from any or all of the acts" described in the petitions. Furthermore, the third petition alleged as additional damages that defendants' actions contributed to the premature death of Yarbrough at age 69.[4] Following the filing of the third petition, all four of the Named Officers filed separate answers denying plaintiffs' allegations while further including cross claims against Liberty and Old Republic, asserting coverage and a duty to defend against the suit.
On June 2, 1997, Liberty filed a motion for summary judgment seeking to declare that its policies with the Federal Land Bank did not provide coverage for the claims asserted by plaintiffs and that it owed no duty to defend the Named Officers. Liberty relied on several exclusion provisions in its comprehensive general liability ("CGL") policy issued to Bank for the initial period of January 1, 1985 to January 1, 1986, and renewed for January 1, 1986 through January 1, 1987. The Named Officers opposed Liberty's motion and filed their own summary judgment motion seeking a declaration that Liberty owed a duty to provide them a defense against plaintiffs' claims. The parties submitted the matters on briefs and the relevant insurance policies.
On April 3, 1998, the trial court issued a ruling denying Liberty's motion for summary judgment on the issue of coverage. The court wrote that although Liberty's policy would indeed exclude coverage for "loan personal injury" if the Old Republic policy provided it, the latter fact had not been established. Because "[r]esolution of Old Republic's coverage depends on a fact-based determination of whether the [Named Officers'] alleged actions or inactions were acts of active and deliberate dishonesty committed with actual dishonest purpose and intent," the court denied Liberty's motion. No appeal or writ application was sought regarding this coverage issue ruling.
On the same day, the trial court issued a separate written ruling regarding Liberty's obligation to defend the Named Officers. In that opinion, the court granted the Named Officers' motion,[5] finding Liberty had a duty to defend them on "the *487 entire suit, even the claims that fall outside the policy's coverage." In the reasons, the court noted its ruling on coverage and concluded that Liberty's policy did not unambiguously exclude coverage based on the allegations in plaintiffs' petition. This conclusion was based particularly on the separate ruling regarding the coverage issue and the finding that plaintiffs petition states a claim within the policy's coverage, "i.e., loan personal injury resulting in mental anguish." A judgment certified as final under C.C.P. art.1915 and effectuating the ruling granting the Named Officer's summary judgment was signed by the court on May 5, 1998. Liberty now appeals presenting the sole issue of whether it has the duty to defend the Named Officers against plaintiffs' suit.

LAW
Summary judgment procedure is designed to secure the just, speedy and inexpensive determination of every action, except those disallowed by law; the procedure is favored and must be construed to accomplish these ends. La. C.C.P. art. 966 A(2). After adequate discovery or after a case is set for trial, a motion which shows that there is no genuine issue as to material fact and that the mover is entitled to judgment as a matter of law shall be granted. Art. 966 C(1). The burden of proof remains with the mover. Art. 966 C(2). Appellate review of summary judgment is de novo, utilizing the same criteria that guide the trial court's grant of the judgment. Guillory v. Interstate Gas Station, 94-1767 (La.3/30/95), 653 So.2d 1152.
It is well settled law that the insurer's obligation to defend suits against its insured is generally broader than its liability for damage claims. Steptore v. Masco Const. Co., 93-2064 (La.8/18/94), 643 So.2d 1213; American Home Assurance Co. v. Czarniecki, 255 La. 251, 230 So.2d 253 (1969); Gleason v. State Farm Mut. Auto. Ins., Co., 27,297 (La.App.2d Cir.8/23/95), 660 So.2d 137, writ denied, 95-2358 (La.12/15/95), 664 So.2d 454. This duty to defend is determined by the allegations of the plaintiffs petition, with the insurer being obligated to furnish a defense unless the petition unambiguously excludes coverage. Id. Thus, if, assuming all the fact allegations of the petition to be true, there would be both (1) coverage under the policy and (2) liability to the plaintiff, the insurer must defend the insured regardless of the outcome of the suit or the eventual determination of actual coverage. The allegations of the petition are liberally interpreted in determining whether they set forth grounds which bring the claims within the scope of the insurer's duty to defend the suit brought against its insured. Yount v. Maisano, 627 So.2d 148 (La.1993); American Home Assurance Co. v. Czarniecki, supra; C.L. Morris, Inc. v. Southern American Ins. Co., 550 So.2d 828 (La.App. 2d Cir.1989); Milano v. Board of Com'rs of Orleans Levee Dist., 96-1368 (La.App. 4th Cir.3/26/97), 691 So.2d 1311.
The insured need not prove the outcome of the suit will necessarily impose liability for plaintiffs claims. Rather, the duty to defend arises whenever the pleadings against the insured disclose even a possibility of liability under the policy. Steptore v. Masco Const. Co., Inc., supra; Ellis v. Transcontinental Ins. Co., 619 So.2d 1130 (La.App. 4th Cir.1993). Thus, even though a plaintiff's petition may allege numerous claims for which coverage is excluded under an insurer's policy, a duty to defend may nonetheless exist if there is at least a single allegation in the petition under which coverage is not unambiguously excluded. Edwards v. Daugherty, 95-702 (La.App. 3d Cir.1/10/96), 670 So.2d 220, writ denied, 96-0362 (La.3/22/96); 669 So.2d 1212; Employees Ins. Representatives, Inc. v. Employers Reinsurance Corp., 94-0676 (La.App. 1st Cir.3/3/95), 653 So.2d 27, writ denied, 95-1334 (La.9/1/95), 658 So.2d 1268; Duhon v. Nitrogen Pumping & Coiled Tubing Specialists, 611 So.2d 158 (La.App. 3d Cir. *488 1992). Put differently, once a complaint states one claim within the policy's coverage, the insurer has a duty to accept defense of the entire lawsuit, even though other claims in the complaint fall outside the policy's coverage. Treadway v. Vaughn, 633 So.2d 626 (La.App. 1st Cir. 1993), writ denied, 94-0293 (La.3/25/94), 635 So.2d 233, and authorities therein; Duhon v. Nitrogen Pumping & Coiled Tubing Specialists, supra.
Whether an insurance contract is ambiguous is a matter of law. Gleason v. State Farm Mut. Auto. Ins. Co., supra. Policies should be construed to effect, not deny coverage. Yount v. Maisano, supra, and authorities therein. Any exclusion from coverage in an insurance policy must be clear and unmistakable. South Cent. Bell Telephone Co. v. Ka-Jon Food Stores, 93-2926 (La.5/24/94), 644 So.2d 357. It is the duty of the insurer to clearly express exclusions or limitations in a liability policy. Little v. Kalo Laboratories, Inc., 406 So.2d 678 (La.App. 2d Cir.1981), writ denied, 410 So.2d 1133 (La.1982). Thus, any ambiguity in an exclusion should be narrowly construed in favor of coverage. South Cent. Bell Telephone Co. v. Ka-Jon Food Stores, supra; Yount v. Maisano, supra.

DISCUSSION
The "Broad Form Comprehensive General Liability Endorsement" of Liberty's CGL policy provides in section II(A):
[Liberty] will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of personal injury ... sustained by any person or organization and arising out of the conduct of the named insured's business ..., and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such injury, even if any of the allegations of the suit are groundless, false or fraudulent.[6]
Additionally, a "Supplementary General Amendatory Endorsement" defines "personal injury" as:
Injury arising out of one or more of the following offenses committed during the policy period:
Mental injury, mental anguish, shock disability, false arrest, false imprisonment, wrongful eviction, detention, malicious prosecution, discrimination..., humiliation, invasion of right of privacy, libel, slander or defamation of character.
The endorsement also defines a "Loan Personal Injury" as one which "arises out of and in connection with a wrongful act relating to loan or lending transactions" but states that it does not apply to "any director, officer or employee of the named insured for whom coverage is provided for `loan personal injury' under any other policy."[7]
Liberty argues in brief that its coverage for "loan personal injury" is unambiguously excluded simply because plaintiffs have alleged that Old Republic provides the same coverage.[8] However, *489 narrowly construing the exclusion in light of the plaintiffs' allegations, we find no merit in this argument.
It is well settled that the allegations of fact, and not conclusions, contained in the petition determine the obligation to defend. Duhon v. Nitrogen Pumping & Coiled Tubing Specialists, Inc., supra; Guidry v. Zeringue, 379 So.2d 813 (La.App. 4th Cir.1980); see also, W.S. McKenzie & H.A. Johnson, III, Insurance Law and Practice, § 211, at 442, in 15 Louisiana Civil Law Treatise (2d Ed.1996). The only references to Old Republic in the second amended and supplemental petitions are in a subparagraph naming it as an additional defendant that generally alleges coverage for the Bank and the Named Officers, and a later paragraph requesting judgment against Old Republic as part of the prayer for relief. Indeed, this is the bare minimum plaintiffs must set forth to bring Old Republic into the suit. To find that such a statement unambiguously excludes coverage under Liberty's policy would clearly produce inequitable results in cases involving multiple insurers whose policies may cover the damages and actions alleged in a plaintiff's petition. We do not believe Czarniecki and its progeny will allow an insurer to deny its duty to defend simply because the plaintiff has previously asserted coverage and a duty to defend by another insurer. See, Allstate Ins. Co. v. Roy, 94-1072 (La.App. 1st Cir.4/7/95), 653 So.2d 1327, writs denied, 95-1121, 95-1215 (La.6/16/95), 655 So.2d 339. This is particularly true in the present case where it is quite clear from the pleadings that many of the facts relevant to determining whether Old Republic's policy provides coverage are in dispute, a factor the trial judge must have considered in finding material issues of fact present regarding the separate and unappealed issue of Liberty's coverage. There is a vast difference between allegations of facts and statements of conclusions in pleadings. Guidry v. Zeringue, supra. Moreover, Old Republic's policy is actually an indemnity policy which does not render it liable to the Named Officers until they actually make payment or sustain a loss. Whether coverage is provided cannot be determined until the lawsuit is concluded. See, Meloy v. Conoco, 504 So.2d 833 (La.1987). As correctly noted by the trial judge, Old Republic's coverage is not yet a proven fact.
Furthermore, in light of the broader scope of the duty to defend, the mere naming of one insurer as a defendant and alleging its policy provides coverage does not absolve another insurer of its duty to defend simply because its policy contains an "other insurance" clause.[9] In the present case, both the Old Republic and the Liberty policies contain "other insurance" clauses, the Old Republic policy containing an "excess" insurance clause[10] and the Liberty Policy's "loan *490 personal injury" provision with an "escape" clause.[11] Generally, when faced with competing escape and excess "other insurance" clauses, Louisiana courts have found them to be irreconcilable and mutually repugnant and pro rate the loss between the two insurers. Graves v. Traders & General Ins. Co., 252 La. 709, 214 So.2d 116 (1968); Citgo Petroleum Corp. v. Yeargin, Inc., 95-1574 (La.App. 3d Cir.2/19/97), 690 So.2d 154, writs denied, 97-1223, 97-1245 (La.9/19/97), 701 So.2d 169, 170; Sledge v. Louisiana DOTD, 492 So.2d 139 (La.App. 1st Cir.1986), writ denied, 494 So.2d 1176 (La.1986); Dette v. Covington Motors, Inc., 426 So.2d 718 (La.App. 1st Cir.1983). Indeed, the presence of such clauses requires the court to determine all facts relative to coverage, terms, and responsibility of the polices. The absence of any of these facts leaves questions of material fact that preclude summary judgment. Dette v. Covington Motors, Inc., supra. Therefore, presence of the conflicting "other insurance" clauses in this case leads to further ambiguities regarding whether Liberty's "loan personal injury" provision precludes coverage on these facts.
Even so, plain reading of the plaintiffs' factual allegations and Liberty's policy provisions does not show that coverage is unambiguously excluded. Clearly, the type of injuries alleged are included as covered "personal injuries" under the previously mentioned endorsements. The petition alleges that one or several of the Named Officers committed acts that caused plaintiffs' damages starting from the initial execution of the dation and lease contract with Yarbrough. Included in these are the failure to disclose the Bank policy of refusing to sell property back to a defaulting debtor or his family and allegations that the Bank through the Named Officers failed to inform Yarbrough of purchase offers from at least two separate individuals in May and June of 1985. The petition therefore sets forth facts showing that some of the claimed wrongful acts occurred during the effective period of the Liberty Policy but prior to the October 31, 1985 effective date of the Old Republic policy. Placed in contrast to the allegations of acts taking place after October 31, 1985 and at least through January 10, 1986, the last day of Yarbrough's lease and right of first refusal, these allegations clearly do not unambiguously exclude coverage but instead have the opposite effect.
In sum, the "loan personal injury" provisions of the Liberty policies at issue simply do not unambiguously exclude coverage for the numerous claims asserted by plaintiffs in their original and amended petitions.[12] Therefore, the District Court properly ruled that Liberty is obligated to defend appellees against the present suit.

CONCLUSION
For the reasons assigned, we affirm the summary judgment on Liberty's duty to defend appellees against plaintiffs' suit. Costs of appeal are assessed to Liberty.
AFFIRMED.
NOTES
[1] The facts contained herein are gathered from the original petition and various amended petitions filed by plaintiffs in this case as well as a prior appeal in this matter, Yarbrough v. Federal Land Bank, 616 So.2d 1327 (La.App. 2d Cir.1993).
[2] Because the Federal Land Banks in Jackson, Alexandria and Rayville had been placed in receivership and had undergone a merger into "Federal Land Bank Associations," the petition added several entities associated with the bank as defendants. We will collectively refer to them as "the Bank."
[3] Bruner died during the pendency of the litigation and his estate was substituted as a party defendant.
[4] Prior to the filing of the third petition, this court handed down its opinion in Yarbrough v. Federal Land Bank, 616 So.2d 1327 (La. App. 2d Cir.1993).
[5] It is unclear from either the judgment or the written reasons whether the court specifically denied Liberty's summary judgment motion on the duty to defend issue, but such intent is implicit in the granting of the opposition motion.
[6] It is undisputed that the officers and directors of the Bank are insureds under Liberty's CGL policy.
[7] We note that this language is contained in the policy issued to the Bank for 1985. While the 1986 language of the "personal injury" provision added certain offenses and the "loan personal injury" exclusion contained slightly different language, we find those changes irrelevant to our resolution of this appeal.
[8] Liberty has neither in briefs to this court nor the trial court contended that the "loan personal injury" coverage is simply not provided under plaintiffs' alleged facts notwithstanding the reference to the Old Republic policy. Thus, they have continually conceded its application in the absence of the Old Republic coverage. Yet, for the first time at oral argument, Liberty's counsel contends that the "loan personal injury" provisions did not apply because the Yarbrough suit involves a lease and not a loan. While we consider this argument to be untimely raised, we find it to be meritless. The provision language broadly states that it is applicable to wrongful acts "relating" to loan transactions. Considering that the lease and right of first refusal was executed on the same date as and essentially formed a part of the dation transaction Yarbrough executed in satisfaction of his loans with the Bank, we find any wrongful acts involving the lease could reasonably be interpreted to "relate" to the original loan transactions, any ambiguity to be read in favor of the insured.
[9] An other insurance clause is a provision that seeks to establish how the liability will be shared in the event that there is other valid and collectible insurance applicable to the same insured. See, McKenzie & Johnson, § 228, at 499.
[10] An "excess" insurance clause generally provides that the coverage of the policy will be excess over other valid and collectible insurance so that the insurer will not be obligated to pay until coverage of the other policy or policies had been exhausted. See, McKenzie & Johnson, § 228, at 499. The Old Republic policy covering the Named Officers states: "The Insurer shall not be liable to make any payment for loss in connection with any claim made against the Directors or Officers: (1) which is insured by another valid policy or policies except in respect of any excess beyond the amount or amounts of payments under such other policy or policies."
[11] An escape clause is intended to make the coverage of the policy applicable only in the event that there is no other coverage available to the insured. See, McKenzie & Johnson, § 228, at 499.
[12] Having found that coverage under the "loan personal injury" provision of Liberty's policies is not unambiguously excluded in the present case, Liberty is obligated to provide a defense to appellees' as to the entire suit. Thus, we pretermit discussion of the other grounds asserted by Liberty for relieving it of its duty to defend or the intervenor brief of United States Fire Insurance Company, an excess insurer who filed a brief in support of one of Liberty's contentions.